NATL. MOTOR FREIGHT TRAFFIC AS-SOCIATION, Inc., Middle Atlantic Conference and Southern Motor Carriers Rate Conference, Inc., Plaintiffs,

Freight Forwarders Institute, Acme Fast Freight, Inc., Natl. Carloading Corporation, and Universal Carloading & Distributing Co., Inc., Intervening Plaintiffs,

v.

UNITED STATES of America

and

Interstate Commerce Commission, Defendants,

The New Dixie Lines, Inc.,

and

Montgomery Ward, Inc., Intervenor Defendants.

Civ. A. No. 1235-65.

United States District Court
District of Columbia.

April 28, 1966.

Bryce Rea, Jr., and F. G. Freund, Washington, D. C., for plaintiff.

Giles Morrow and James L. Givan, Washington, D. C., for intervening plaintiffs.

David G. Bress, U. S. Atty, Donald F. Turner, Asst. Atty. Gen., and Joe F. Nowlin, Dept. of Justice, for defendant United States.

Robert W. Ginnane, Gen. Counsel, and Raymond M. Zimmet, Washington, D. C., for defendant Interstate Commerce Commission.

James E. Wilson, and Edward G. Villalon, Washington, D. C., for intervenor-defendant New Dixie Lines, Inc.

Paul A. Porter and William D. Rogers, Washington, D. C., for intervenor-defendant Montgomery Ward, Inc.

Before LEVENTHAL, Circuit Judge, and MATTHEWS and HART, District Judges.

HART, District Judge.

This action seeks to set aside an Order of the Interstate Commerce Commis-

sion,[1] jurisdiction being founded upon Sections 1336, 1398, 2284 and 2321 through 2325 of Title 28 of the United States Code. It is concerned with Section 408 of the Freight Forwarder Act[2] which permits common carriers to extend lower "assembling" and "distribution" rates not only to freight forwarders but also to other shippers who employ the services of the carriers under like conditions. The plaintiffs contend that the Commission erred in permitting the lower "assembling" rates, which by definition require a forward movement beyond a consolidation point, to be made available to shippers whose forward transportation would be in their own private vehicles rather than through the utilization of the services of the line-haul common carriers.

Plaintiffs are non-profit membership corporations whose members are common carriers of property by motor vehicle operating in interstate commerce. The intervening plaintiffs who join in this challenge to the Commission's Order, are the Freight Forwarders Institute, an unincorporated association representing major freight forwarding companies, and several individual freight forwarders. Defendants, in addition to the United States of America and the Interstate Commerce Commission, are The New Dixie Lines, Inc., a motor vehicle common carrier of property, and Montgomery Ward, Inc., the prime user of the services of New Dixie.

An adequate presentation of the parties' positions and the disposition of the case necessarily requires a full explanation of the functions performed by freight forwarders and the circumstances precipitating their ultimate regulation by Congress in 1942.

Freight forwarders collect and consolidate less than carload or less than truckload shipments and secure common carrier transportation for the long haul movement of property owned by individual shippers by carload or truckload. In accomplishing this, the forwarder consolidates several small, less than truckload shipments into a full truckload or carload quantity which then moves over the major portion of the journey by common carrier at the lower truckload or carload rate. In reality what may appear as a single operation actually involves three distinct phases, each phase involving a different common carrier. First the goods of each individual shipper are carried to a central consolidation point. Second, the aggregated property then is transported over the line haul by a common carrier to a break-bulk or distribution point; and finally, the goods are moved from the distribution center to the various ultimate consignees. Without the intervention of the forwarder each small individual shipper would be required to deal with the several carriers involved, paying each carrier the more expensive less than truckload or less than carload rate for the entire movement from pick-up point to the final delivery point. The freight forwarder offers the shippers a more expeditious, comprehensive transportation service at a lesser cost. The details of arranging transportation are completely cared for by the forwarder and some savings are passed on to the shipper through the differential between full capacity truckload and carload rates over the line haul and the more expensive less than truckload or less than carload rates over the line haul.

Historically, forwarder operations were originally confined to the transportation centers serviced by railroads. The limited mobility of the rail restricted the outlying areas which could be served economically as pick-up or final delivery points. However, with the growth of an unregulated motor carrier industry, forwarders increasingly substituted truck service for rails in all three phases of their operations. This employment of

1. Assembling Rates to Atlanta, Charlotte, Greensboro, Statesville, Investigation and Suspension Docket, No. M–17891, 323 I.C. C. 543 (1964).

2. 56 Stat. 284 (1942), Part IV of the Interstate Commerce Act, 49 U.S.C. § 1001 et seq.

the motor carriers presented forwarders, in addition to the same quantity discounts offered by the railroads on long hauls, an opportunity to profitably expand their assembling and distributing services. Whereas profitability was strictly limited to the margin between carload and less than carload rates applicable to the line haul when forwarders utilized railroads, further rate concessions were secured when truck transportation was substituted.

The additional rate concessions, which were not available from the already regulated railroads, were in the form of private agreements between the forwarders and the motor carriers. The forwarders charged the shippers a through rate from pick-up to final destination and the motor carriers concurred in this rate. The fee charged the shipper was then divided among the forwarder and the motor carriers on a basis determined from their agreements.

These revenue divisions operated until 1935 when Congress passed the Motor Carrier Act, 49 U.S.C. § 301 et seq. This Act substantially equalized motor common carriers and the already regulated rail common carriers by requiring the motor carriers to publish tariffs naming their rates and charges, forbidding them from charging more or less than their published rates and prohibiting discrimination in the rates charged different shippers.

Under the Motor Carrier Act freight forwarders would be required, as any other shipper, to pay the motor carriers' published truckload and less than truckload rates for their services, thus depriving the forwarders of the satisfactory revenue divisions previously established with the motor carriers. In order to avoid this result, the forwarders filed with the Interstate Commerce Commission their through rates from pick up, through long haul to delivery, concurred

in by the motor carriers as "joint rates." In Acme Fast Freight, Inc., Common Carrier Application, 8 M.C.C. 211 (1938) 17 M.C.C. 549 (1939), the Commission held that forwarders were not common carriers by motor vehicle subject to the Motor Carrier Act, and that they could not lawfully establish joint rates with the motor carriers.[3]

The Commission's ruling respecting "joint rates" threatened to curtail the growing motor common carriers' business generated by the freight forwarders. To compensate for this anticipated loss of revenue, certain motor carriers established "proportional rates" applicable to less than truckload shipments (a) to a point of consolidation for movement beyond as part of a carload or truckload shipment or (b) from a point of break-bulk following movement thereto as part of a carload or truckload shipment. These "proportional rates" were lower than the motor carriers' less than truckload rates applicable to local shipments not involving a subsequent or preceding truckload movement by common carrier. In practice the "proportional rates" would be available only to freight forwarders and a few other large individual shippers. In Chicago and Wisconsin Points Proportional Rates, 10 M.C.C. 556 (1938), 17 M.C.C. 573 (1939), the majority of the Interstate Commerce Commission held the proposed proportional rates discriminatory because freight forwarders "will be afforded transportation at rates lower than the rates which will be charged certain other shippers under substantially similar circumstances and conditions."[4] Chairman Eastman and the other dissenting members of the Commission felt that the work done by the motor carriers for freight forwarders was performed under different circumstances and conditions and therefore different rates would be justified without being discriminatory.

---

3. This holding was affirmed sub nom. Acme Fast Freight v. United States, 30 F.Supp. 968 (S.D.N.Y.1940), aff'd per curiam 309 U.S. 638, 60 S.Ct. 810, 84 L.Ed. 993 (1940).

4. 17 M.C.C. at 579. This holding was affirmed sub nom. United States v. Chicago Heights Trucking Co., 310 U.S. 344, 60 S.Ct. 931, 84 L.Ed. 1243 (1940).

Following the "joint rates" and "proportional rates" cases freight forwarders were required to pay the motor common carriers' published less than truckload rates for the consolidation of and distribution of small shipments. This severely restricted the outlying areas which could be economically served by forwarders. Congressional action was ultimately required to correct the situation.

In 1942 Congress passed the Freight Forwarder Act, 49 U.S.C. § 1001 et seq., to integrate the position of freight forwarders into the overall common carrier transportation industry. The views of Chairman Eastman prevailed and were incorporated as the regulatory scheme selected to balance the interests of the shipping public, the common carriers and the freight forwarders. Chairman Eastman, while concurring in the "joint rates" decision, recognized that "there is need for the adequate public regulation of * * * forwarding companies," [5] but stressed a concern for all aspects of the public transportation industry. He stated, "[Freight forwarders] perform a service useful not only to those who have small lots of merchandise or package freight to ship but also to the carriers whose services * * [they] * * * utilize." [6]

That Congress was concerned with and intended to secure a balancing of interests between the freight forwarders and the common carriers is clearly indicated by the remarks of Congressman Wolverton in support of the Act: "[T]he committee entertained the firm conviction that the service rendered by freight forwarders has proved highly beneficial to shippers and, under proper regulation, should be equally helpful to the carriers that perform the actual transportation for the forwarders." [7]

Congress, in adopting the Freight Forwarder Act, rejected the initial Senate proposal which allowed forwarders to enter into joint rate agreements with the carriers. The reason for this rejection was the fear that through the vehicle of "joint rates" forwarders would divert income from the carriers. "[T]he tremendous bargaining power which the larger forwarders would have by reason of the great amount of traffic which they control, would inevitably enable them to divert from the carriers performing the actual transportation important amounts of revenue." [8] Additionally a "joint rates" solution would jeopardize the careful balancing of interests fostered by the Act. "The forwarders have favored the authorization of joint rates as a permanent matter. Upon most careful consideration, however, your committee has concluded that the likelihood of abuse is so great, and injury to the underlying carriers so probable, as to make it imperative, in the interest of the public and for the good of the transportation system of the country as a whole, that Congress should adopt the definite policy of forbidding such rates." [9]

The key provision setting forth the intent of Congress embodied in the Freight Forwarder Act is section 408, 49 U.S.C. § 1008.

"Nothing in this Act shall be construed to make it unlawful for common carriers * * * to establish and maintain assembling rates * * and/or distribution rates * * * applicable to freight forwarders and others who employ or utilize the instrumentalities or services of such common carriers under like conditions, which differ from other rates * * * which contemporaneously apply with respect to the employment or utilization of the same instrumentalities or services, if such difference is justified by a difference in the respective conditions under which such instrumentalities or services are employed or

5. Acme Fast Freight, Inc., Common Carrier Application, 8 M.C.C. 211, 228.

6. Id. 17 M.C.C. 549, 557.

7. 87 Cong.Rec. 8221 (1941).

8. 87 Cong.Rec. 8218 (Remarks of Congressman Wolverton) (1941).

9. Ibid.

utilized. For the purposes of this section (1) the term 'assembling rates or charges,' means rates * * * for the transportation of less-than-carload or less-than-truckload shipments into a point for further movement beyond as part of a carload or truckload shipment, and (2) the term 'distribution rates or charges' means rates * * * for the transportation of less-than-carload or less-than-truckload shipments moving from a point into which such shipments have moved as a part of a carload or truckload shipment. The provisions of this section shall not be construed to authorize the establishment of assembling rates * * * covering the line haul transportation between the principal concentration point and the principal break-bulk point."

This action involves an interpretation of Section 408 by the Interstate Commerce Commission and arises from the following background. Montgomery Ward, Inc., employs New Dixie, a motor common carrier, to transport small shipments of textile products from a host of small textile factories in Georgia, North Carolina, South Carolina and Virginia to four assembly stations operated by Montgomery Ward. At these assembly stations the textile goods are consolidated into truckload lots for the long haul movement beyond.

In 1962 New Dixie established assembling rates pursuant to Section 408 which applied to the less than truckload shipments of textile products moving from textile factories to Montgomery Ward's assembly stations. Assembling Rates at Charlotte and Greensboro, N. C., 318 I.C.C. 429 (1962). New Dixie's 1962 tariffs provided that the assembling rates applied only when Montgomery Ward moved the consolidated textile shipments beyond the assembly stations in truckload quantities "over a common carrier by motor vehicle or over a common carrier by railroad." [10]

However, Montgomery Ward utilizes, in addition to common carriers, its privately owned vehicles to perform the long haul truckload movement beyond the assembly stations. Thus, under the 1962 tariffs, New Dixie would charge Montgomery Ward differing rates on the transportation of less than truckload shipments of textile products into Ward's assembly stations depending on the ownership of the vehicle selected for the subsequent long haul truckload movement. If Montgomery Ward employed another common carrier to transport the consolidated textile goods in truckload quantities beyond the assembly stations, then New Dixie charged a lower assembling rate on its corresponding less than truckload transportation into the assembly stations. If Montgomery Ward used its privately owned vehicles to perform the long haul, then New Dixie charged a rate higher than the assembling rates on its corresponding less than truckload transportation into the assembly stations.

At the behest of Montgomery Ward, New Dixie proposed to amend its tariffs, effective November 25, 1963, so that the lower assembling rates would apply regardless of whether the long haul truckload movement beyond the assembly stations was in common carriers or in vehicles privately owned by Montgomery Ward. The Interstate Commerce Commission, after investigation, found the proposed amendment lawful if certain technical revisions were made respecting the definition of "truckload." Assembling Rates to Atlanta, Charlotte, Greensboro, Statesville, 323 I.C.C. 543 (1964).

---

10. The assembling rates and charges published in this tariff apply only on less-than-truckload freight transported for a freight forwarder or freight consolidator to an assembling point named in this tariff, there delivered to the freight forwarder or freight consolidator and reshipped by the freight forwarder or freight consolidator within the time limit provided in Item 50 over a common carrier by motor vehicle as part of a straight or mixed truckload shipment or over a common carrier by railroad as part of a straight or mixed carload shipment. Item 100 defines Montgomery Ward as a freight consolidator. The New Dixie Lines, Inc., Local Freight Tariff No. 2–D. MF–ICC No. 12, Item 30.

The plaintiffs, in seeking to have the Commission's ruling set aside, agree that New Dixie's assembling rates may in certain circumstances be available to Montgomery Ward.[11] They contend, however, that it was the intent of Congress that "assembling rates" could apply only when the line haul truckload movement is performed by a common carrier.

In support of the Commission, the defendants collectively assert that the application of Section 408 does not depend upon the ownership of the vehicle employed in the line haul truckload or carload movement and that no legislative history supports a Congressional intent to authorize assembling rates only if the line haul truckload movement is performed by a common carrier. To the contrary, we find ample evidence in support of the plaintiffs' position.

As already seen, when Section 408 was enacted as the means of preserving freight forwarder service to distant pick-up and delivery points, Congress deliberately rejected a "joint rates" solution to the problem.[12] The concept of joint rate agreements was rejected in part because of the then prevailing view that freight forwarders were shippers vis-à-vis the carriers and therefore "[j]oint rates between shippers and carriers are anomalous."[13]

Primarily, however, Congress abandoned the proposed joint rates because of the harmful result to common carriers' revenues as compared with a system of assembling and distribution rates. "[T]he authorization of joint rates between forwarders and the actual carriers would inevitably result in the unjustified diversion to the forwarders of important revenues needed by the carriers to maintain a proper public service. * * * "[14] This selection by Congress clearly indicates a concern not merely with freight forwarders, but an intent to foster the national transportation policy which necessarily includes line haul common carriers.

While the lower rates envisaged in Section 408 are available to individual shippers such as Montgomery Ward who use the services of common carriers in consolidating and distributing property in the same manner as freight forwarders would utilize a common carrier, Congress was careful to exclude such shippers from the regulatory features of the Act. To ensure the freedom of private shippers from regulation, Section 402(c) (1), 49 U.S.C. § 1002(c) (1), provides:

"The provisions of this part shall not be construed to apply (1) to the operations of a shipper * * * in consolidating or distributing freight for [himself] * * * on a nonprofit basis, *for the purpose of securing the benefits of carload, truckload, or other volume rates.*" (Emphasis supplied).

This section was designed to clarify the legislative definition of a "freight forwarder" and to "make absolutely sure, however, that the definition cannot by construction be held to cover shippers * * * consolidating or distributing freight for themselves * * *."[15]

A freight forwarder was defined in the Act as one who holds himself out to the public to assemble and distribute freight for compensation, assuming responsibility therefor and who utilizes the services

11. Section 408 makes the assembling and distribution rates "applicable to freight forwarders and *others* who employ or utilize the instrumentalities or services of such common carriers under like conditions." There is no dispute that the word "others" applies to Montgomery Ward.

12. Joint rates were authorized in the following proposals: S. 3665, 76th Cong., 3rd Sess. (1940) ; S. 3666, 76th Cong., 3rd Sess. (1940) ; S. 210, 77th Cong., 1st Sess. (1941) as originally passed by the Senate; H.R. 3684, 77th Cong., 1st Sess. (1941).

13. Hearings on H.R. 3684, Before the House Committee on Interstate and Foreign Commerce, 77th Cong., 1st Sess., 132 (1941).

14. 88 Cong.Rec. 4066 (1942), (Remarks of Congressman Wolverton)

15. H.R.Rep.No.1172, 77th Cong., 1st Sess., 6 (1941).

of common carriers.[16] An individual shipper like Montgomery Ward, who assembled and distributed his own freight, did not come within this definition of a freight forwarder because he did not hold himself out to the general public for compensation. Nevertheless, the operations of such a shipper were so identical to a freight forwarder in that both consolidated small shipments to secure the benefit of common carrier truckload and carload line haul rates that Congress inserted Section 402(c) (1) to prevent misapplication of the Act.

■ Section 402(c) (1) refers to the factual pattern upon which Congress predicated the Freight Forwarder Act. This included the line haul utilization of common carriers by freight forwarders and others to secure the benefit of such carriers' truckload, carload or other volume rates. The language of this section acknowledges the pervasive factual pattern presented to Congress and shows the clear Congressional intent that assembling rates are applicable only when common carriers are utilized for the line haul.

■ The defendants contend that in Section 408, Congress concerned itself only with conditions regarding the assembly and distribution stages and that the mode of line haul movement was irrelevant. This position is not well founded. It ignores the Act's coverage which extends from the initial pick-up point through line haul to the final delivery point. By dwelling upon the reference to "like conditions" contained in the first sentence of Section 408, the defendants dismiss the definition of "assembling rates" immediately following. Assembling rates apply only to less than carload or less than truckload shipments into a consolidation point "for further movement beyond as part of a carload or truckload shipment." 49 U.S.C. § 1008.

If Congress was not concerned with the mode of the subsequent line haul movement, then any such movement would appear sufficient. Yet Congress specified that the line haul must be in "carload" or "truckload" lots, and further defined those terms in "reference to the quantity or quantities specified for the application of particular rates under the tariffs and classifications of the carriers whose services the freight forwarders utilize."[17] In defining "carload" and "truckload" in this manner, Congress expressed a concern with the mode selected to accomplish the line haul transportation, and plainly intended that this be performed by common carriers. Any other interpretation would not as clearly "preserve a national transportation system adequate to meet the needs of the commerce of the country and of the national defense." [18] This intent is more apparent since the common carrier who performs the consolidation service is different from the common carrier engaged in line haul operations. A "national transportation system" must include line haul common carriers among its elements.

■ The defendants argue, and with some effectiveness, that the Commission ruling will result in lower freight costs

---

16. "The term 'freight forwarder' means any person which (otherwise than as a carrier subject to chapters 1, 8 or 12 of this title) holds itself out to the general public to transport or provide transportation of property, or any class or classes of property, for compensation, in interstate [or foreign] commerce, and which, in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, and (C) utilizes, for the whole or any part of the transportation of such shipments, the services of a carrier or carriers subject to Chapters 1, 8 or 12 of this title." In 1950 this Section was modified by inserting "as a common carrier" following "to the general public." 49 U.S.C. § 1002(a) (5).

17. H.R.Rept.No.1172, 77th Cong., 1st Sess. 11 (1940).

18. 88 Cong.Rec. 4065 (1942) (Remarks of Congressman Lea).

which presumably would result in lower prices to the ultimate consumers. However, the plaintiffs contend that the ruling will only benefit the largest distributors able to operate their own line-haul transportation systems and thus the lower freight costs will only increase the competitive advantage of such distributors over smaller retailers. Such policy considerations are properly presented to the legislature. It is our function and duty as a Court to adhere to the balancing of interests fashioned by Congress, including the interest of the common carriers, and not to upset that balance for reasons of policy, which may or may not commend themselves to the legislature.

 We recognize the general principle that an interpretation by the Interstate Commerce Commission is entitled to great weight.[19] In this case the Commission's interpretation, rather than being "contemporaneous" with the passage of the Freight Forwarder Act in 1942, emerged only some 20 years later. This delay lessens the weight to be given the Commission's construction.[20] Moreover our decision turns not upon factual conflicts, nor does it challenge the Commission's technical expertise, instead it resolves itself upon the interpretation of legislative intention. That is a question properly decided by the Court.[21]

We are aware that the Commission supported its ruling on the ground that the consolidation work done by New Dixie for Montgomery Ward was identical whether the goods moved beyond the consolidation points by private or common carriage. Of course, this would be true if the goods never were moved

from the consolidation points. The point is that the statute is concerned with the forward movement. A statute such as this cannot be read with an eye to perfect logic. It reflects a balancing of interests, and in this the common carriers were a significant interest which was taken into account by Congress and which cannot now be ignored by the Courts.

Both plaintiffs and defendants refer to succeeding amendments to various sections of the Act as indications of the Congressional intent embodied in Section 408. The important issue is what Congress intended at the time Section 408 was enacted and subsequent amendments and legislative opinions " * * * would not supplant the contemporaneous intent of the Congress which enacted the [Freight Forwarder Act]."[22]

 Congress did not consider an isolated segment of the transportation industry in this Act. Rather it was clearly aware of the effect the pending legislation would exert upon all transportation operations. The shipping public, freight forwarders, the assembling and distributing common carriers and the line haul common carriers were all considered and protected. The logical balancing of these complementary yet competing interests requires the finding that the assembling rates in Section 408 apply only when the carload or truckload line haul movement beyond the consolidation point is by common carrier.

The Order of the Commission is set aside. Counsel for plaintiffs will prepare an Order in accordance with the views expressed in this opinion.

19. United States v. American Trucking Ass'ns., 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); Doyle Transfer Co. of Glasgow, Ky. v. United States, 45 F.Supp. 691, 695 (D.D.C.1942).

20. United States v. American Trucking Ass'ns., ibid; Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1932).

21. N.L.R.B. v. Hearst Publications, Inc., 322 U.S. 111, 130–131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). Accord Norwegian Nitrogen Products Co. v. United States, id.; United States v. American Trucking Ass'ns., id.

22. Fogarty v. United States, 340 U.S. 8, 14, 71 S.Ct. 5, 95 L.Ed. 10 (1950). Accord United States v. United Mine Workers, 330 U.S. 258, 281–282, 67 S.Ct. 677, 91 L.Ed. 884 (1947).