589 F.2d 696
 191 U.S.App.D.C. 173
 NEW YORK FOREIGN FREIGHT FORWARDERS & BROKERS ASSOCIATION,
et al., Federal Maritime Commission, Lyons Transport, Inc.,
Southern Pacific Marine Transport, Inc., and International
Ass'n of NVOCC's, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
National Motor Freight Traffic Ass'n, Inc., Federal Maritime
Commission Marseilles-North Atlantic U.S.A. Freight
Conference, et al., Pacific Westbound Conference, Lyons
Transport, Inc., and Import Freight Carriers, Inc., American
Trucking Association, Inc., National Motor Freight
Association, Inc., Southern Pacific Marine Transport, Inc.,
International Association of NVOCCS, The Household Goods
Forwarders Association of America, Inc., Continental North
Atlantic Westbound Freight Conference, et al., Trans-Pacific
Freight Conference of Japan/Korea and Japan Korea-Atlantic &
Gulf Freight Conference, Intervenors.
FREIGHT FORWARDERS INSTITUTE et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
IML Freight, Inc., Household Goods Forwarders Ass'n, Pacific
Westbound Conference, American Trucking
Association, Inc., Trans-Pacific Freight
Conference of Japan/Korea, et
al., Intervenors.
 Nos. 75-1867, 77-1353.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 10, 1978.
Decided Nov. 24, 1978.
As Amended Jan. 19, 1979.
 
 Robert W. Ginnane, Washington, D. C., for petitioners Freight Forwarders Institute et al., in No. 77-1353.
 Gerald H. Ullman, New York City, for petitioner, The New York Foreign Freight Forwarders & Brokers Ass'n, Inc., et al., in No. 75-1367.
 Gordon M. Shaw, Atty., Federal Maritime Commission, Washington, D. C., with whom Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, Washington, D. C., for petitioners Federal Maritime Commission in No. 75-1867.
 Henri F. Rush, Associate Gen. Counsel, I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel and Charles H. White, Jr., Associate Gen. Counsel, I. C. C., Barry Grossman and Robert J. Wiggers, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondents in Nos. 75-1867 and 77-1353.
 John R. Attanasio, Washington, D. C., with whom Stanley O. Sher and Jacob P. Billig, Washington, D. C., were on the brief for Marseilles-North Atlantic U.S.A. Freight Conference et al., intervenor in No. 75-1867.
 Nelson J. Conney, Washington, D. C., with whom Robert L. James, Bryce Rea, Jr., Patrick McElegot and Leo C. Franey, Washington, D. C., were on the brief for American Trucking Associations Inc., et al., intervenors in Nos. 75-1867 and 77-1353.
 Ann M. Pougiales, San Francisco, Cal., was on the brief, for IML Freight, petitioner in No. 75-1867 and intervenor in No. 77-1353.
 James H. Pipkin, Jr., Washington, D. C., was on the brief, for Southern Pacific Marine Transport, Inc., petitioner in No. 75-1867.
 Raymond P. deMember, Washington, D. C., was on the brief, for International Ass'n of NVOCCS, petitioner in No. 75-1867.
 Harold E. Spencer and Thomas F. McFarland, Jr., Chicago, Ill., were on the brief, for Lyons Transport, Inc., etc., petitioners in No. 75-1867.
 Alan F. Wohlstetter, Washington, D. C., was on the brief, for Household Goods Forwarders Ass'n of America, Inc., intervenor in Nos. 75-1867 and 77-1353.
 Edward D. Ransom, R. Frederic Fisher and Barbara H. Buggert, San Francisco, Cal., were on the brief, for Pacific Westbound Conference, intervenor in Nos. 75-1867 and 77-1353.
 Charles F. Warren & Warren Associates, P. C., Georgia A. Quadrino, Washington, D. C., and John E. Ormand, Jr., were on the brief, for Trans-Pacific Freight Conference of Japan/Korea, et al., intervenors in Nos. 75-1867 and 77-1353.
 Howard A. Levy, Cleveland, Ohio, and Patricia E. Byrne were on the brief, for Continental North Atlantic Westbound Freight Conference, et al., intervenor in No. 75-1867.
 James L. Pimper, Atty., Federal Maritime Commission, Washington, D. C., entered an appearance for petitioner, Federal Maritime Commission in No. 75-1867.
 Fritz R. Kahn and Hanford O'Hara, Associate Gen. Counsel, I. C. C., Washington, D. C., entered appearances for respondent, I. C. C. in No. 75-1867.
 John H. D. Wigger and Robert B. Nicholson, Atty., Department of Justice, Washington, D. C., entered appearances for U. S. A., respondent, in Nos. 75-1867 and 77-1353.
 Before LEVENTHAL and MacKINNON, Circuit Judges, and JAMESON,* District Judge for the District of Montana.
 Opinion of the Court filed by Circuit Judge LEVENTHAL.
 LEVENTHAL, Circuit Judge:
 
 
 1
 This case is an offshoot of the decision of the Interstate Commerce Commission (ICC) in its extensive International Joint Rates and Through Routes proceeding.[1] In response to the growth of "intermodal" methods for the transport of goods in international trade, the ICC held that it possessed statutory authority to permit rail, motor or water carriers (domestic carriers) regulated by it under Parts I, II and III of the Interstate Commerce Act (Act)[2] to enter into joint rates[3] with oceangoing carriers operating in foreign commerce.[4] This ruling of the Commission was affirmed by this court. Pennsylvania v. ICC, 182 U.S.App.D.C. 280, 561 F.2d 278 (1977).
 
 
 2
 The Commission expressly deferred consideration in that proceeding of whether freight forwarders regulated under Part IV of the Act[5] should be permitted to enter into similar joint rate arrangements with oceangoing carriers. It also left open the question of whether nonvessel operating carriers (NVO's), which perform in ocean commerce a function similar to that of freight forwarders, should be permitted to enter into joint rates with domestic carriers.[6]
 
 
 3
 By notice of proposed rulemaking on July 29, 1975, the Commission undertook to resolve these questions. On February 14, 1977, it issued the Report and Order that are brought before us by the petitions for review.[7] As to freight forwarders, the Commission found in Part IV no basis for statutory authority comparable to the bases it had found for the domestic carriers in Parts I, II and III.[8] The Commission further held that, because of their similarity to freight forwarders, NVO's should be precluded as a matter of policy from entering into joint rate arrangements with domestic carriers.[9]
 
 
 4
 On review, we are persuaded that the Commission's conclusions represent permissible exercises of its discretion, and we therefore affirm. We emphasize, however, that the Commission retains flexibility to reconsider its conclusions in the light of future developments.
 
 I. FREIGHT FORWARDERS
 
 5
 The ICC's conclusion that Part IV of the Act provides no statutory authority for freight forwarders to enter into international joint rate arrangements rested on the premise that "specific authority" was required before such rates should be permitted.[10] The Commission did not consider the desirability of such rates as a matter of policy. Various freight forwarders and freight forwarder organizations challenge the ICC's construction of the governing statute. While we read the statute somewhat differently, we believe that the Commission's view represents a reasonable determination, in light of the regulatory framework, not to exercise its discretion to reach the merits.
 
 A. The Regulatory Background
 
 6
 We begin our analysis by taking account of the development of regulation of freight forwarders.
 
 
 7
 Freight forwarders[11] provide a useful service to small shippers of goods. They hold themselves out as providing a complete transportation service from point of origin to destination, publishing their own applicable rate schedules, issuing bills of lading, and assuming primary responsibility for the safe transportation of the shipment. Forwarders differ from other domestic carriers in that they do not own or operate the equipment by which the goods are transported. Instead they contract with underlying common carriers for the actual transportation. They make their profit by consolidating smaller shipments into carload (or truckload) lots and taking advantage of the "spread" between the carload and less-than-carload rates published by the underlying carriers.[12]
 
 
 8
 Unlike the other carriers subject to regulation under the Act, freight forwarders possess dual qualities: they have the quality of a common carrier in relation to their shippers, and the quality of a shipper in relation to the underlying carriers. The history of regulation of freight forwarders has been influenced by a certain tension between these two qualities.
 
 
 9
 Freight forwarders initially welcomed the protections afforded by shipper status. When the railroads attempted in the early twentieth century to eliminate freight forwarders by instituting a regulation that the tenderer of goods for shipment had to be their actual owner, the ICC agreed with the forwarders that they were to be treated as shippers and were entitled to the protection of the Act's anti-discrimination provisions.[13]
 
 
 10
 Beginning in the 1920's and 1930's, forwarders increasingly employed motor carriers as the underlying carriers. It was common practice for the then-unregulated motor carriers to offer preferential rates to large volume shippers. While forwarders had received from the railroads nothing more than the carload rates offered all shippers, they used their economic power as controllers of large volumes of goods to obtain preferential truckload rates from motor carriers. "It does not appear that the motor carriers regarded freight forwarders as being different from any preferred shipper. The willingness of motor carriers to negotiate with forwarders does not appear to have been based on any opinion that the latter was (sic) a 'common carrier.' "[14]
 
 
 11
 After motor carriers were brought under federal regulation by the Motor Carrier Act of 1935,[15] forwarders attempted to preserve preferential arrangements. Characterizing themselves as common carriers, they styled their arrangements as "joint rates" and filed tariffs with the ICC. The Commission rejected the tariffs on the ground that while forwarders were common carriers with respect to their customers, they were not common carriers by motor entitled to file joint rates within the meaning of the Motor Carrier Act.[16] Subsequently, in United States v. Chicago Heights Trucking Co., 310 U.S. 344, 60 S.Ct. 931, 84 L.Ed. 1243 (1940), the Supreme Court affirmed the cancellation by the ICC of "proportional" rates between freight forwarders and motor carriers on the ground that such rates were joint rates in disguise. The Court approved the Commission determination that such rates constituted illegal favoritism among shippers under § 216(d) of the Motor Carrier Act.[17] 310 U.S. at 350-53, 60 S.Ct. 931.
 
 
 12
 In 1942, Congress enacted the Freight Forwarders Act,[18] which became Part IV of the Interstate Commerce Act and which brought freight forwarders under federal regulation. Freight forwarders were not, however, expressly characterized as common carriers, and except for a few narrowly defined circumstances they were not given authority to enter into joint rates with domestic carriers.[19] In Chicago, M., St. P. & Pac. R. Co. v. Acme Fast Freight, Inc., 336 U.S. 465, 69 S.Ct. 692, 93 L.Ed. 817 (1949), the Supreme Court held that the Freight Forwarders Act did not alter the basic status of freight forwarders as shippers in relation to the underlying carriers.
 
 
 13
 Congress amended Part IV in 1950, using words that expressly recorded the status of freight forwarders as common carriers.[20] However, the accompanying committee report stated that the amendment was not intended to modify the current state of the law.[21] Further, the committee expressed the view that nothing in the amendment would permit joint rates between freight forwarders and domestic carriers.[22] At least implicitly, the committee accepted the freight forwarders' dual qualities.
 
 
 14
 In 1970 the ICC conducted, at the request of Congress, an extensive investigation into the problems of freight forwarders. The ICC adhered to the position that joint rates between freight forwarders and domestic carriers are prohibited.[23] It proposed an experimental modification of the prohibition,[24] but Congress has not adopted this recommendation.
 
 
 15
 This survey suggests that the regulatory response to freight forwarders has always been informed by a concern lest freight forwarders use their control of large volumes of shipments to obtain preferential rates from the underlying carriers. In this view, "joint rates" proposed by freight forwarders are not arrangements between connecting carriers engaged in a joint venture but are essentially devices to extract from the underlying carriers an inequitable arrangement, not justified by efficiency, favoring them over other shippers.[25]
 
 
 16
 The legal principle prohibiting joint rates for freight forwarders has developed in the context of proposals for joint rates with domestic carriers. The principle applies equally to relationships between freight forwarders and oceangoing carriers. As with domestic carriers, freight forwarders stand in the position of shippers Vis-a-vis oceangoing carriers, and similar dangers are present.
 
 B. Statutory Analysis
 
 17
 Contrary to the ruling of the ICC, the freight forwarders claim that § 402(a) and § 6(12) of the Interstate Commerce Act provide statutory authority for the Commission to permit joint rates between freight forwarders and ocean-going carriers.
 
 
 18
 Section 402(a)(5) defines a freight forwarder in part as "any person which (otherwise than as a (domestic carrier)) holds itself out to the general public as a common carrier . . . in interstate commerce."[26] Section 402(a)(6) defines "interstate commerce" for purposes of Part IV:
 
 
 19
 The term "interstate commerce" means transportation (A) between a point in a State and a point in another State, whether or not such transportation takes place wholly within the United States; (B) between points within the same State but through any place outside thereof; or (C) from or to any point in the United States to or from any point outside thereof, but only insofar as such transportation takes place within the United States.[27]
 
 
 20
 Section 6(12) is a general provision barring discrimination by carriers subject to the Act in entering into cooperative arrangements with ocean carriers:
 
 
 21
 If any common carrier subject to this Act enters into arrangements with any water carrier operating from a port in the United States to a foreign country, through the Panama Canal or otherwise, for the handling of through business between interior points of the United States and such foreign country, the Commission may by order require such common carrier to enter into similar arrangements with any or all other lines of steamships operating from said port to the same foreign country.[28]
 
 
 22
 As to § 402(a), the Commission stated in its Report and Order that it had "searched part IV of the Act in vain" for any provisions that could reasonably be interpreted as conferring joint rate authority on freight forwarders.[29] The Commission noted that § 6(12) had initially applied only to railroads, and had been extended to Part II motor and Part III water carriers before the enactment of Part IV. It found in the 1950 amendment designating forwarders as common carriers no intent on the part of Congress to bring freight forwarders within § 6(12). The Commission held that, in any event, § 6(12) could not provide an independent basis of authority in the absence of specific authority elsewhere in Part IV.[30]
 
 
 23
 The freight forwarders challenge these conclusions, arguing, in effect, that the statutory provisions involved here are indistinguishable from those that the ICC found authorized joint rates between Part I, II, and III carriers and ocean carriers. In affirming the Commission as to these rates, in Pennsylvania v. ICC, supra, this court exhaustively analyzed those statutory provisions. The court found "explicit" statutory authority for joint rates involving Part I rail carriers and Part II motor carriers in language of the jurisdictional provisions of each Part that could be said to have contemplated "intermodal" arrangements between domestic and ocean carriers. Part I of the Act applies to carriers engaged in
 
 
 24
 transportation of passengers or property . . . Partly by railroad and partly by water when both are used under . . . (an) arrangement for a continuous carriage or shipment . . . from or to any place in the United States to or from a foreign country, but only insofar as such transportation . . . takes place within the United States.[31]
 
 
 25
 The court held that joint rates were encompassed within the provision as one type of arrangement for continuous carriage.[32]
 
 
 26
 Part II of the Act similarly confers jurisdiction over "the transportation of passengers or property by motor carriers engaged in interstate or foreign commerce"[33] and in turn defines "foreign commerce" as including
 
 
 27
 commerce, whether such commerce moves wholly by motor vehicle or Partly by motor vehicle and partly by rail, express, or Water, (A) between any place in the United States and any place in a Foreign country.[34]
 
 
 28
 Part II further provides that motor carriers "may establish reasonable through routes and joint rates"[35] with common carriers by water, and requires that motor carriers file tariffs showing all joint rates that have been established in connection with foreign commerce.[36]
 
 
 29
 The court also relied upon § 6(12) as consistent with the finding of explicit statutory authority, observing that to empower the ICC to proscribe discrimination by domestic carriers in entering into arrangements with ocean carriers for the handling of through business would be meaningless if those carriers did not have the ability to enter into such arrangements in the first instance.[37]
 
 
 30
 In our view, the fact that § 402(a) contains none of the specific "intermodal" language that provides express authority in Parts I and II is highly material to our resolution of this issue. While it is true that in Pennsylvania v. ICC, supra, this court was confronted with a similar lack of specific authority for Part III water carriers, we found no basis there to suppose that Congress had intended to distinguish water carriers from rail and motor carriers.[38]
 
 
 31
 However, the long recognition of the dual qualities of freight forwarders as both shippers and carriers does suggest a basis for supposing that Congress perceived a distinction between Part IV freight forwarders and the carriers governed by Parts I, II and III. We do not say that Congress provided a clearcut and continuing instruction concerning freight forwarders. On the one hand, the 1950 amendment did accede to freight forwarders' requests to be accorded common carrier status. And, while the amendment consisted solely of the insertion of the term "common carrier" into the definitional provision of § 402(a)(5),[39] we cannot say that this demonstrates an intent to exclude freight forwarders from the seemingly general provisions of § 6(12). On the other hand, the legislative history reflects a continuing recognition of the quality of freight forwarders as shippers, by its indication that the amendment did not thereby provide authority for joint rates.
 
 
 32
 The overall emanation from the 1950 amendment is that while Congress made no immediate change in the law as to joint rates it did not necessarily intend to freeze the development of the law of freight forwarders. The underlying law that was left unchanged was one that recognized a discretionary role for the ICC in adjusting the "common law" of the Interstate Commerce Act to changes in economic realities. The rules that had evolved to prevent overreaching by the freight forwarders, viewed as shippers, were subject to reconsideration if this danger receded and the carrier quality of forwarders advanced.
 
 
 33
 This view might ordinarily require a remand to the Commission, for its Report is not cast in these terms. However, we think a fair reading of the Report is that the Commission believed that matters were such that it was not prepared to exercise its administrative discretion, preferring instead to await congressional guidance. The ICC put forward a legal conclusion from the absence of express authority. In context, we discern that this also embodied a policy judgment against assertion of such authority in the face of deliberate congressional restraint.[40] In light of Congress's withholding of authority for freight forwarders to enter into joint rates with domestic carriers and the lack of a strong showing of interest on the part of the supposed beneficiaries of the proposed rates, the small shippers[41] this cannot be condemned as a lawless approach.
 
 
 34
 Future changes in the characteristics of freight forwarders or the emergence of more compelling demands for the proposed rates may alter the underlying concerns. Proposals for deregulation may also have an effect on the regulatory framework. The Commission retains discretion to take a fresh look should circumstances develop. In the present state of flux, we do not mandate the ICC to give the problem the kind of attention that a remand would require.
 
 II. NON-VESSEL OPERATING CARRIERS (NVO'S)
 
 35
 We turn to the Commission's second holding, which barred nonvessel operating common carriers by water (NVO's) from entering into international joint rates with domestic carriers. The Federal Maritime Commission (FMC), various NVO associations and individual NVO's challenge this determination. We believe the Commission acted within its discretion in conforming its determination as to NVO's to the rule of law it found applicable to Part IV freight forwarders.
 
 
 36
 The Commission's decision was based in substantial part on a concern that permitting joint rates between NVO's and domestic carriers would create dangers of illegal discrimination among shippers similar to those that have informed the regulatory treatment of freight forwarders. The Commission first noted: "It appears to us that NVO's possess the same legal and economic characteristics as freight forwarders, and that therefor as a matter of law they stand on no better footing than freight forwarders with respect to authority to enter into joint rates with other common carriers."[42] The Commission preferred, however, to ground its decision on policy, rather than as a matter of law. It relied on the belief that "there is substantial danger of rebate and discrimination abuses if NVO's are allowed to enter into joint rates with ICC regulated carriers, for the same reasons which apply to freight forwarders."[43]
 
 
 37
 Petitioners first argue that the Interstate Commerce Act evinces an intent on the part of Congress not to permit the ICC to distinguish between NVO's and vessel operating carriers by water (VO's) in its regulation of joint arrangements between domestic carriers and oceangoing carriers, as well as a positive intent to permit joint rates between domestic carriers and NVO's.[44] In support of this proposition, petitioners point to § 216(c) and § 305(b) of the Act.[45] These provisions, as amended in 1962, grant to the ICC exclusive jurisdiction over joint rates between domestic motor or water carriers and ocean carriers on routes between the contiguous 48 states and either Alaska or Hawaii. They specifically provide that NVO's are among the ocean carriers with which the domestic carriers may enter into joint rates.
 
 
 38
 These provisions do not sustain petitioners' broad extrapolation. If anything, Congress's apparent limitation of joint rate authority for NVO's to the Alaska/Hawaii trade points toward an intent, or at least a realization, that such authority was not necessarily present in other circumstances.
 
 
 39
 Nor do we draw the negative inference that FMC counsel finds in § 1003(b) of the Federal Aviation Act:[46] "Congress has demonstrated that it knows how to limit authorizations for joint rates between ICC-regulated and non-ICC regulated carriers to exclude non-equipment operating non-ICC regulated carriers."[47] The mere fact that Congress chose to make its will explicit in one case does not mean that it intended in all other cases to require the opposite result.
 
 
 40
 We conclude that Congress left to the ICC a discretion to put NVO's on the same basis as freight forwarders in terms of relations to domestic carriers.
 
 
 41
 Petitioners' remaining arguments attack the Commission's policy rationale. Running through them is the common theme that the Commission's equation of the economic characteristics of freight forwarders and NVO's is inaccurate. We find the Commission's characterization of the economic functions of NVO's, at least in terms of relations with domestic carriers, to be amply supported by the record.
 
 
 42
 NVO's resemble domestic freight forwarders in that they hold themselves out to assume responsibility for the total shipment, and contract with underlying vessel-owning carriers for the actual transportation by water in foreign commerce.[48] NVO's represent a comparatively recent phenomenon in the overseas transport of goods. While ocean freight forwarders, which act as brokers and make transportation arrangements in the name of primary shippers but do not assume common carrier responsibility, have long been on the scene, the lack of a differential between boatload and less-than-boatload rates negatived any financial incentive for them to obtain common carrier status. The development of containerized shipment techniques, however, made possible a profitable business based on consolidating small shipments into full container lots.
 
 
 43
 Although NVO's would seem to present the same potential for undue discrimination among shippers employing VO's that is presented for freight forwarders with respect to domestic carriers, the FMC has chosen not to adopt a distinction for regulatory purposes between NVO's and VO's.[49] However, the FMC's regulatory jurisdiction begins only at the water's edge. Here, the ICC was concerned not with the relationship between NVO's and VO's, but rather with the relationship between NVO's and domestic carriers subject to the ICC's jurisdiction.
 
 
 44
 By seeking to enter into joint rates with domestic carriers, NVO's are attempting, in effect, to extend the scope of their activities inland from the water's edge. They propose to consolidate small shipments into container lots at inland points, transport the containers via a domestic carrier to the port and then place the containers on board vessels operated by a VO.[50] Despite the efforts of petitioners to conceptualize a distinction,[51] it is difficult to perceive how the role of the NVO's in this process differs materially from the role of a freight forwarder; each stands as a shipper with respect to the domestic carrier. The fact that the NVO may be the connecting carrier at the other end of the trip does not remove its initial characteristic as a shipper. This characteristic also serves to distinguish NVO's from VO's. While domestic carriers are permitted to enter into joint rates with VO's, the VO's act only as connecting carriers, with none of the characteristics of shippers.
 
 
 45
 Because NVO's possess the characteristics of shippers in relation to the domestic carriers, the concern for undue discrimination among shippers that informs the regulatory framework for freight forwarders also arises in this situation. The Commission could reasonably act on this concern to protect the rate structures of domestic carriers subject to regulation by it.
 
 
 46
 We believe the Commission's conclusion reflects a full consideration of the record. The characteristics of NVO's as shippers and the dangers presented were fairly apparent from the record. Further, the Commission was not arbitrary in reaching its conclusion in the face of assertions that permitting joint rates would benefit shippers and promote efficiency. As noted above, there was little showing of interest on the part of the shippers, the group that would supposedly benefit from the proposed joint rate arrangements.[52]
 
 III. CONCLUSION
 
 47
 The modern revolution in "intermodal" transport of goods in international commerce has brought with it the demand for the streamlining of the legal devices that facilitate such commerce. One such device is the joint international through rate. The Commission responded to the demand in the comprehensive decision that was affirmed in Pennsylvania v. ICC, supra. In this case it has chosen not to extend the holding of Pennsylvania to two hybrid shipper/carriers, freight forwarders and nonvessel operating carriers. These carriers argue that the public interest requires their vindication, yet the shippers, which would supposedly benefit from these changes, evidenced little interest in them. We conclude that the Commission did not exceed its discretion. We also note the Commission's conclusion that other devices exist that will accomplish essentially the same result as would joint rates.[53] The Commission retains flexibility to reconsider its conclusions in the light of future circumstances.
 
 
 48
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 Ex Parte No. 261, 337 I.C.C. 625 (1970). This was the first in a series of five reports on this subject by the ICC. See also 341 I.C.C. 246 (1972); 346 I.C.C. 688 (1974); 350 I.C.C. 361 (1975); 351 I.C.C. 490 (1976)
 
 
 [2]
 49 U.S.C. §§ 1 Et seq., 301 Et seq., 901 Et seq. (1970). No effort has been made to conform citations to those adopted by Congress in its extensive codification, without substantive changes, of the Interstate Commerce Act as 49 U.S.C. §§ 10101 Et seq. P.L. 95-473, 92 Stat. 1337 (October 17, 1978)
 
 
 [3]
 Judge Wilkey's opinion for the court in Pennsylvania v. ICC, 182 U.S.App.D.C. 280, 283-84, 561 F.2d 278, 281-82 (1977), aptly defines joint rates:
 A joint through rate is a single charge published by one carrier and concurred in by connecting carriers as the rate that will apply on a through movement of cargo from a point of origin on the line of one carrier to a point of destination on the line of the other. Each participating carrier retains a "division" of the joint through rate agreed upon between the carriers.
 Generally, a joint through rate is Lower than the sum of the purely local rates separately published by each participating carrier. Similarly, divisions of joint rates are generally lower than the corresponding local rate.
 (Emphasis in original.)
 As will be noted, See p. --- of --- U.S.App.D.C., p. 701 of 589 F.2d Infra, the proposed "joint rates" at issue in this case differ significantly from the joint rates between connecting carriers that were involved in Ex Parte No. 261.
 
 
 [4]
 The ICC's action was prompted in large part by the rapid growth of containerization since its inception in 1957. The ICC explained the need for joint rates as follows:
 (I)t is our goal to facilitate the through transportation of freight by intermodal carriers between the United States and foreign countries. A shipper is benefited when he can make a contract with the originating carrier which covers a movement through to the destination at a total charge published in a single tariff. Moreover, the national transportation policy should be fostered and the free flow of commerce spurred by encouraging the establishment of more economical and integrated transportation services between the United States and foreign countries.
 Ex Parte No. 261, 337 I.C.C. 625, 627 (1970).
 Ex Parte No. 261 reversed a longstanding Commission policy against joint rates between domestic carriers and ocean carriers. In Cosmopolitan Shipping Co. v. Hamburg American Packet Co., 13 I.C.C. 206 (1908), the Commission had adopted that policy because the ocean carriers were unregulated. The Commission adhered to the policy until the institution of Ex Parte No. 261, even though ocean carriers had been brought under federal regulation by the Shipping Act of 1916, 39 Stat. 728 (1916), 46 U.S.C. §§ 801 Et seq. (1970). The Commission in Cosmopolitan Shipping Co. also relied on § 1 of the Interstate Commerce Act as distinguishing between foreign commerce in general and foreign commerce with adjacent countries. 24 Stat. 379 (1887); 34 Stat. 584 (1906). This distinction was removed by the amendments to § 1(1) of the Interstate Commerce Act contained in the Transportation Act of 1920, 41 Stat. 474, 49 U.S.C. § 1(1) (1970). In Ex Parte No. 261, the Commission characterized its policy of not accepting joint rates from 1920 to 1970 as a "self-imposed restriction on jurisdiction." 337 I.C.C. at 629. See generally Pennsylvania v. ICC, 182 U.S.App.D.C. at 285-90, 561 F.2d at 283-88.
 
 
 [5]
 49 U.S.C. §§ 1001 Et seq. (1970)
 
 
 [6]
 Ex Parte No. 261, 337 I.C.C. 625, 636 (1970). As to freight forwarders, the Commission deferred consideration because of the pendency of Ex Parte No. 266, a separate proceeding to investigate the overall status of freight forwarders. NVO's were excluded from consideration because of their functional similarities to freight forwarders. On petition for reconsideration by the NVO's, the Commission adhered to this decision. Ex Parte No. 261, 341 I.C.C. 246, 247 (1972). In its freight forwarder investigation, the Commission eventually concluded that: "At this time we are not convinced that they should be given that right with respect to other common carriers subject, not to our jurisdiction, but to the regulation of other Federal agencies." Ex Parte No. 266, Investigation into the Status of Freight Forwarders, 339 I.C.C. 711, 808 (1971) (hereafter cited as Investigation ). As to NVO's, the Commission noted that it had considered permitting domestic carriers to enter into joint rates with them, because the Federal Maritime Commission, the primary regulatory body of ocean carriers, made no distinction between vessel operating and nonvessel operating carriers. However, it again deferred the issue pending an FMC investigation into the status of NVO's. Id. at 808-09. See note 49 Infra
 
 
 [7]
 Ex Parte No. 261 (Sub No. 1), Tariffs Containing Joint Rates and Through Routes Freight Forwarders and Non-Vessel Operating Common Carriers by Water (NVO) (Feb. 14, 1977) (hereafter cited as Report and Order ); J.A. at 585
 
 
 [8]
 Id. at 2-5; J.A. at 586-89
 
 
 [9]
 Id. at 5-7; J.A. at 589-91
 
 
 [10]
 Id. at 2; J.A. at 586
 
 
 [11]
 Section 402(a)(5) of the Interstate Commerce Act, 49 U.S.C. § 1002(a)(5) (1970) defines "freight forwarder" as:
 any person which (otherwise than as a carrier subject to chapters 1, 8, or 12 of this title) holds itself out to the general public as a common carrier to transport or provide transportation of property, or any class or classes of property, for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of breakbulk and distributing operations with respect to such consolidated shipments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, and (C) utilizes, for the whole or any part of the transportation of such shipments, the services of a carrier or carriers subject to chapters 1, 8, or 12 of this title.
 
 
 [12]
 Investigation, supra note 6, 339 I.C.C. at 713-15
 
 
 [13]
 Export Shipping Co. v. Wabash R. Co., 14 I.C.C. 437 (1908), Aff'd sub nom. ICC v. Delaware, L. & W. R. Co., 220 U.S. 235, 31 S.Ct. 392, 55 L.Ed. 448 (1911)
 
 
 [14]
 Investigation, supra note 6, 339 I.C.C. at 719
 
 
 [15]
 49 Stat. 543 (1935), Codified as Part II of the Interstate Commerce Act, 49 U.S.C. §§ 301 Et seq. (1970)
 
 
 [16]
 Acme Fast Freight, Inc., 2 M.C.C. 415 (1937), 8 M.C.C. 211 (1938), Aff'd sub nom. Acme Fast Freight, Inc. v. United States, 30 F.Supp. 968 (S.D.N.Y.), Aff'd per curiam, 309 U.S. 638, 60 S.Ct. 810, 84 L.Ed. 993 (1940)
 
 
 [17]
 Interstate Commerce Act § 216(d), 49 U.S.C. § 316(d) (1970)
 
 
 [18]
 56 Stat. 284 (1942), Codified at 49 U.S.C. §§ 1001 Et seq. (1970)
 
 
 [19]
 See Investigation, supra note 6, 339 I.C.C. at 722-725
 
 
 [20]
 64 Stat. 1113 (1950); 49 U.S.C. § 1002(a)(5) (1970)
 
 
 [21]
 Therefore, to describe freight forwarders as common carriers, as the amendment made by the first section of this bill proposes to do, does not change the status which they have always had, but simply recognizes that status by statutory law. This will remove any anomaly and confusion regarding the status of freight forwarders and make clear that they have the status of common carriers
 H.R.Rep.No.2489, 81st Cong., 2d Sess. 8 (1950), U.S.Code Cong.Serv. 1950, p. 4216.
 
 
 [22]
 Certain objections were raised in the hearings to the first section of the bill on the ground that declaring freight forwarders to be "common carriers" would permit the establishment of joint rates between them and other types of carriers subject to the Interstate Commerce Act. On this question it is sufficient to point out that no class of common carrier subject to the act has authority to enter into joint rates with other common carriers of the same class or of any other class unless authority to do so is specifically granted in the act. After the enactment of the amended bill here reported, no authority will exist for joint rates between freight forwarders and other carriers except (for certain limited exceptions)
 Id. at 8-9, U.S.Code Cong.Serv. 1950, p. 4223.
 
 
 [23]
 Investigation, supra note 6, 339 I.C.C. at 808
 
 
 [24]
 See id. at 809
 
 
 [25]
 See the remarks of Representative Wolverton, the ranking minority member of the House Committee on Interstate and Foreign Commerce, who presented the only extended discussion of the original Freight Forwarders Act:
 it would be illogical and anomalous to permit the making of joint rates (between forwarders and underlying carriers). The maintenance of a joint rate by a carrier and a shipper would be an absurdity. If nevertheless permitted, it would enable such shipper to receive rebates through the medium of divisions of the joint rate.
 
 
 [87]
 Cong.Rec. 8218 (1941), Quoted in Chicago, M., St. P. & Pac. R. Co. v. Acme Fast Freight, Inc., 336 U.S. 465, 478, 69 S.Ct. 692, 93 L.Ed. 817 (1949). See also National Motor Freight Traffic Ass'n v. United States, 253 F.Supp. 661, 665 (D.D.C.1966)
 
 
 [26]
 49 U.S.C. § 1002(a)(5) (1970). For full text of this provision, see note 11 Supra
 
 
 [27]
 49 U.S.C. § 1002(a)(6) (1970)
 
 
 [28]
 49 U.S.C. § 6(12) (1970)
 
 
 [29]
 Report and Order, supra note 7, at 2-3; J.A. at 586-87
 
 
 [30]
 Id. at 3-4; J.A. at 587-88
 
 
 [31]
 Interstate Commerce Act, § 1(1), 49 U.S.C. § 1(1) (1970) (emphasis added)
 
 
 [32]
 182 U.S.App.D.C. at 287-88, 561 F.2d at 285-86
 
 
 [33]
 Interstate Commerce Act § 202(a), 49 U.S.C. § 302(a) (1970)
 
 
 [34]
 Id. § 203(a)(11), 49 U.S.C. § 303(a)(11) (1970) (emphasis added)
 
 
 [35]
 Id. § 216(c), 49 U.S.C. § 316(c) (1970)
 
 
 [36]
 Id. § 217(c), 49 U.S.C. § 317(c) (1970)
 
 
 [37]
 If joint ocean/rail rates cannot be created and filed in the first place, section 6(12), with its "similar arrangement" terminology, would be rendered meaningless. . . . We believe that section 6(12) contemplates the existence of joint rail/ocean through routes and rates and therefore provides further statutory support for the existence of jurisdiction to require the filing of joint through rates
 182 U.S.App.D.C. at 289, 561 F.2d at 287.
 
 
 [38]
 (W)e find nothing in Part III purporting to prohibit filing voluntary adopted joint rates in foreign commerce between FMC and ICC-regulated water carriers. The question is whether Congress, without explicitly stating that domestic and foreign water carriers can voluntarily enter into and file joint rates, intended, Sub silentio, to preclude the ICC from issuing rules permitting domestic water carriers voluntarily to do so just as their competitors, the rail and motor carriers, do. We do not think that Part III can be read so narrowly or that Congress' silence on this point can be elevated into such significance as to put Part III carriers in a different posture than their motor and rail carrier competitors
 182 U.S.App.D.C. at 292, 561 F.2d at 290.
 
 
 [39]
 64 Stat. 1113 (1950), 49 U.S.C. § 1002(a)(5) (1970)
 
 
 [40]
 In this regard, we are reminded of the presumption referred to by Justice Marshall in Atchison, T. & S.F. R. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 807-08, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973):
 A settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that these policies will be carried out best if the settled rule is adhered to.
 
 
 [41]
 Despite the assertions by both freight forwarders and NVO's that it is the small shippers who will be the ultimate beneficiaries of joint rates, the 598 pages of the Joint Appendix contain only one presentation by a shipper in support of the proposed rates. See J.A. 28-42 (Statement of George F. Begnal on behalf of General Electric Co.)
 
 
 [42]
 Report and Order, supra note 7, at 5; J.A. at 589
 
 
 [43]
 Id. at 6; J.A. at 590
 The Commission adduced several other justifications for its NVO holding. By obtaining certification as an NVO, a freight forwarder could enter into joint rates with domestic carriers and circumvent the prohibition against joint rates. Permitting NVO's to enter into joint rates with domestic carriers might allow them to engage in freight forwarding in the United States without the certification required by Part IV. The minimal requirements for NVO certification by the FMC would raise the potential of unfair competition for freight forwarders who must meet more rigorous standards. Id. at 5-6; J.A. at 589-90. Because we conclude that the ICC's concern for the potential of undue discrimination provides a sufficient basis for its decision, we need not consider these justifications in detail. We do note, however, that they also stem from the ICC's perception that, in their relations to domestic carriers, freight forwarders and NVO's possess essentially similar economic characteristics.
 
 
 [44]
 Brief of Petitioner FMC at 13-14; Brief of Petitioner International Ass'n of NVOCC's at 8-9
 
 
 [45]
 49 U.S.C. §§ 316(c), 905(b) (1970)
 
 
 [46]
 49 U.S.C. § 1483(b) (1970):
 air carriers not directly engaged in the operation of aircraft in air transportation . . . may not establish joint rates or charges . . . with common carriers subject to the Interstate Commerce Act.
 
 
 [47]
 Brief of Petitioner FMC at 13
 
 
 [48]
 No statutory provisions comparable to Part IV of the Interstate Commerce Act regulate NVO's. Instead, the Federal Maritime Commission has chosen to recognize them as common carriers by water in interstate commerce within the meaning of § 1 of the Shipping Act of 1916, 46 U.S.C. § 801 (1970). In Common Carriers by Water Status of Express Companies, Truck Lines and Other Non-Vessel Carriers, 6 F.M.B. 245, 256-57 (1961), the Commission's predecessor held:
 We conclude that a person or business association may be classified as a common carrier by water who holds himself out by the establishment and maintenance of tariffs, by advertisement and solicitation, and otherwise, to provide transportation for hire by water in interstate or foreign commerce, as defined in the Shipping Act, 1916; assumes responsibility or has liability imposed by law for the safe transportation of the shipments; and arranges in his own name with underlying water carriers for the performance of such transportation, whether or not owning or controlling the means by which such transportation is effected, is a common carrier by water as defined in the Shipping Act, 1916.
 
 
 [49]
 See Common Carriers by Water, supra note 48; Bernhard Ulmann Co. v. Porto Rican Express Co., 3 F.M.B. 771 (1952). The FMC has permitted NVO's to participate in through routes and joint rates with other carriers subject to its regulation. See 35 Fed.Reg. 6395 (1970) ("There is nothing in our statutes or regulations which prohibits NVO's from entering into through route and through rate arrangements, and nothing has been advanced herein which requires their exclusion from the provisions of our through rate and through route rule"). See also 40 Fed.Reg. 47,776 (1975) ("We have always considered the (NVO) as any other common carrier by water"). In deferring consideration of whether NVO's should be permitted to enter into joint rates with domestic carriers, the ICC pointed to a Preliminary Staff Report on Non-Vessel Operation Common Carriers by Water, issued by the FMC on December 8, 1970, in which the similarity of NVO's to freight forwarders was recognized and the recommendation was made that NVO's be treated as shippers in their relationship to the underlying carriers. Investigation, supra note 6, 339 I.C.C. at 808-09. Apparently no proceeding was initiated as a result of this recommendation
 
 
 [50]
 See J.A. at 55-60 (statement of H. Ronald Jordan on behalf of C. S. Greene & Co., Inc.); Id. at 92 (statement of National Customs Brokers & Forwarders Ass'n, Inc., and New York Foreign Freight Forwarders & Brokers Ass'n, Inc.); Id. at 132 (statement of H. Lynn Davis on behalf of IML Freight, Inc.)
 
 
 [51]
 The Federal Maritime Commission argues vigorously that NVO's do not possess the economic characteristics of freight forwarders because (1) some NVO's handle only full container lots and do not engage in consolidation or break-bulk functions; (2) some NVO's do not utilize the services of ICC-regulated equipment operating carriers; (3) some NVO's operate only between United States ports and interior points in foreign countries. Brief of Petitioner FMC at 10. This argument skirts the central issue, however. The fact that not all NVO's employ the services of domestic carriers has no relevance to the essential similarity of NVO's and freight forwarders when NVO's do employ domestic carriers. Similarly, the material characteristic of the NVO in relation to the domestic carrier is that it stands in the position of a large volume shipper; the means by which the goods are assembled have little relevance to the underlying concerns raised by the NVO's shipper status
 
 
 [52]
 See p. --- & n.41 of --- U.S.App.D.C., p. 704 & n.41 of 589 F.2d Supra
 
 
 [53]
 Report and Order, supra note 7, at 7-8; J. A. at 591-92