UNITED STATES ET AL. *v.* CHICAGO HEIGHTS
TRUCKING CO. ET AL.

No. 724.   Argued April 26, 29, 1940.—Decided May 20, 1940.

*Mr. A. H. Feller,* with whom *Solicitor General Biddle, Assistant Attorney General Arnold,* and *Messrs. Frank Coleman, William J. Campbell, Daniel W. Knowlton,* and *E. M. Reidy* were on the brief, for appellants.

*Messrs. John R. Turney* and *R. E. Quirk* for appellees.

MR. JUSTICE BLACK delivered the opinion of the Court.

Respondents are forty-one interstate common carriers operating motor vehicles subject to the Interstate Commerce Commission under the Federal Motor Carrier Act of 1935.[1] Our decision turns upon the validity of an order of the Commission cancelling certain proposed tariffs of these carriers upon the ground that they were unlawfully discriminatory in affording lower rates to "forwarders" of freight than to other shippers.

Forwarders utilize common carriers by rail and motor truck to transport goods owned by others. They solicit and obtain many small shipments, from various points within an area, and cause them to be carried in less than truck-load or carload lots to a concentration center within the area. There they are assembled by the forwarder for further transportation in truck-load or carload lots. Although the forwarder gives owners of individual small shipments his own contract corresponding in form to through bills of lading and assumes responsibility for safe through carriage, the forwarder customarily arranges for the pickup, assembly and transportation of the shipments by carriers for hire. And the forwarders, not the owners of the goods, select the carriers and

---

[1] 49 Stat. 543.

route the shipments. Upon arrival of a truck-load or carload of the assembled small shipments at a distribution center, the bulk shipment is broken up, the forwarder separates and takes possession of the original small shipments and arranges, where necessary, their further carriage to their various final destinations in the area served by the particular distribution point. In this final carriage of the small shipment to its ultimate destination, the forwarder again utilizes carriers for hire to move these less than truck-load or carload lots. Thus, forwarders may use the service of carriers to assemble shipments of less than truck-load or carload lots at their concentration center, to transport the assembled truck-load or carloads to a distribution center and to carry the broken up small shipments beyond their break-bulk distribution center.

The forwarding business has been built upon the expectation that a material part of the transportation which it causes to be provided for small shippers can by consolidation of small shipments be obtained at truck-load or carload rates. For the forwarders' business was originally made profitable because it could operate upon the margin of profit represented by the difference between railroad carload rates paid by the forwarder and the higher rates, approximating less than carload rates, which the forwarder charged the owner of a shipment.[2] But forwarders in using railroads enjoy no special tariff rates and pay the same published carload and less than carload rates that other shippers pay. And the question here it not whether the Commission should have approved as lawful lower rates for truck-loads than for smaller shipments, but whether the court properly set aside the Commission's order which had directed cancellation of re-

---

[2] See *Interstate Commerce Comm'n* v. *Delaware, L. & W. R. Co.*, 220 U. S. 235, 243.

spondents' tariffs providing lower rates for certain less than truck-load shipments solely because they had previously been, or were intended subsequently to be, consolidated in truckloads with other individual shipments.

Upon the Commission's own motion, a hearing was held and the Commission ordered the cancellation of these tariffs.[3] Respondents brought suit in the District Court to set aside and restrain enforcement of the Commission's order. A three judge court held the order void and perpetually enjoined its enforcement. The case is here on direct appeal by the United States and the Interstate Commerce Commission.[4]

Respondents' tariffs would be available to forwarders who arrange assembling, transportation and distribution services in the trade areas surrounding concentration and break-bulk centers in Illinois, Wisconsin and Indiana. And the Commission found that "In practical effect these rates can be used by few, if any, shippers, except the forwarders." Since in its opinion these tariffs were "materially lower than respondents' local rates on like traffic between the same points," [5] the Commission found that "the forwarders . . . and possibly a few large shippers . . . will be afforded transportation at rates lower than the rates . . . charged certain other shippers under substantially similar circumstances and conditions, in violation of Section 216 (d)." [6] In the view we take, it be-

---

[3] Division 5 first reported, 10 M. C. C. 556. On reconsideration, the report was by the Commission, 17 M. C. C. 573.

[4] 28 U. S. Code, 45, 45 (a), 47 (a), 345.

[5] Two Commissioners in dissent thought this was "true only in part. They are lower than some, but by no means all, of the corresponding local rates."

[6] § 216 (d): "It shall be unlawful for any common carrier by motor vehicle engaged in interstate or foreign commerce to make, give, or cause any undue or unreasonable preference or advantage to any particular person, port, gateway, locality, or description of

comes unnecessary to consider additional grounds upon which the Commission found the tariffs violated another Section of the Act.[7]

So far as pertinent here, the tariffs before us propose rates for transportation of commodities in less than truck-load lots. All commodities (with exceptions not here material) are as a group given the same special rate. In general, respondents' other tariffs provide rates which vary for different types of commodities. Accordingly, if the suspended rates were in effect, transportation of the same commodity over the same haul might cost a forwarder less than other shippers.

The findings of the Commission and the supporting evidence [8] reveal that local less-than-truck-load rates charged shippers are in many if not most instances greater than rates on like commodities between the same points to be afforded forwarders under the proposed tariffs which the Commission ordered cancelled. However, upon reviewing the identical evidence which the Commission had considered, the court below drew inferences opposite to those of the Commission and disagreed with its conclusion that in operation the disputed tariffs would violate § 216 (d) which forbids undue preferences and advantages that lead to unjust discrimination. The exercise of judgment by the Commission and by the court

---

traffic in any respect whatsoever, or to subject any particular person, port, gateway, locality, or description of traffic to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever: *Provided, however,* That this paragraph shall not be construed to apply to discriminations, prejudice, or disadvantage to the traffic of any other carrier of whatever description."

[7] See § 217 (a), (b).

[8] The District Court found that some of the local "rates are higher and some lower than the suspended rate," but the average revenue derived by the respondents from local rates "per hundred pounds . . . upon the whole, is less than" that produced by the suspended rates.

in appraising the same evidence has led,to these opposing conclusions.

The tariffs apply on " 'All freight' (except as otherwise provided . . .), which has been transported to . . . [an] origin station . . . , as a part of a truck-load consignment or carload consignment moving under tariffs or schedules lawfully on file with the Interstate Commerce Commission and immediately reshipped in the original packages as an L. T. L. [less than truck-load] shipment: or

"(b) 'All freight', . . . which is to be transported to . . . [a named] destination station . . . as an L. T. L. shipment, and immediately reshipped in the original package as part of a truck-load consignment or carload assignment moving under tariffs or schedules lawfully on file with the Interstate Commerce Commission."

It is evident that these special tariffs are available only to shippers who intend and are able (a) to arrange immediate further transportation in carloads or truck-loads for commodities that have been carried in less than truckload lots, or (b) to move commodities in less than truckload lots immediately after they have been carried as part of a carload or truck-load. While, as has been noted, some few large shippers may possibly avail of the tariffs, there is no question about the finding of the court below that the "principal traffic which will be carried under the suspended rates is what is called by the Commission 'freight forwarder traffic.' "

Almost since its inception the Commission has been called upon to exercise its judgment relative to the Interstate Commerce Act as applied to forwarders.[9] Initial hostility of the railroads caused them to deny forwarders the advantage of their published rates. However, when

_____

[9] See, e. g., Export Shipping Co. *v.* Wabash Railroad Co., 14 I. C. C. 437; Freight Forwarding Investigation, 229 I. C. C. 201; Acme Fast Freight, Inc., Common Carrier Application, 8 M. C. C. 211.

called upon to decide, the Commission held that the railroads' action discriminated against forwarders and declared forwarders to be entitled as shippers to published carload rates. This Court sustained the action of the Commission.[10]

About 1920, prior to the Motor Carriers Act, forwarders began to utilize motor carriers. Forwarders and truckers operated under individual contracts providing divisions of the complete line haul charge. After the tariff provisions of the Motor Carriers Act went into effect, forwarders filed tariff schedules with the Interstate Commerce Commission on the assumption that they were subject to the Act as common carriers. Tariffs so filed were, however, ordered cancelled by the Commission upon the ground that forwarders were not motor carriers subject to the Act. A three judge District Court upheld the Commission [11] and this Court affirmed.[12]

Here, the complaint itself has alleged that the so-called "proportional" tariffs under consideration "name rates which are identical with" the divisions of through L. C. L. rates which respondents would have received had the forwarders' tariffs been upheld. And, as stated by the Commission, "Stripped of protective coloring, these rates are published as proportional rates primarily as a matter of expediency to serve the purpose of certain freight forwarders and to perpetuate in another form so-called divisions of purported joint rates of the freight forwarders."

Respondents contend that the Commission improperly concluded that the canceled tariffs create undue preferences or advantages resulting in unjust discriminations in

[10] *Interstate Commerce Comm'n* v. *Delaware, L. & W. R. Co.*, 220 U. S. 235.

[11] 8 M. C. C. 211, *Acme Fast Freight, Inc.* v. *United States,* 30 F. Supp. 968.

[12] *Acme Fast Freight, Inc.* v. *United States,* 309 U. S. 638.

violation of 216 (d) because there was no evidence that the suspended rates would subject any particular person or type of traffic to disadvantage or injury; while the suspended rates, applicable on all classes of traffic, might be lower as to some commodities, the aggregate compensation from them would not be less than that from like local traffic if all such local traffic is considered; services rendered by respondents to the forwarders are unlike and less burdensome than local services rendered individual shippers; services rendered the forwarders are on longer hauls than on other local less than truck-load commodity traffic; terminal services rendered forwarders by respondents are less expensive than in the case of other shippers; forwarders bear the expense of soliciting business thereby relieving respondents of that burden; the only evidence before the Commission was introduced by respondents; and no shippers complained of injury.[18]

Weighty as these arguments were, they did not persuade the Commission that forwarders could without discrimination be given lower L. T. L. rates than other shippers. The Commission was impressed by the facts that the proposed rates were not in reality available to all of the shipping public and in practical effect would operate for the special benefit of the forwarders and would not benefit the owner of goods shipped; that § 216 (d) of the Act represented a manifestation of the congressional purpose in Part I, § 2, and Part II, § 202 (a) of the Interstate Commerce Act, to prevent favoritism by insuring equality of treatment on rates for substantially similar services; and that the proposed tariff would afford "forwarders . . . , and possibly a very few large shippers . . . , transportation at rates lower

---

[18] These arguments for sustaining the tariffs were all forcefully presented in the dissenting opinion of Chairman Eastman, concurred in by Commissioner Mahaffie.

than the rates which . . . [would] be charged certain other shippers under substantially similar circumstances and conditions, in violation of Section 216 (d)." Moved by these considerations, the Commission concluded that the mere fact that forwarders might ordinarily furnish a volume of traffic greater than but identical in kind with that furnished by individual shippers did not justify lower rates for forwarders.

"It is not disputable that from the beginning the very purpose for which the Commission was created was to bring into existence a body which from its peculiar character would be most fitted to primarily decide whether from facts, disputed or undisputed, in a given case preference or discrimination existed." [14] And where a court substituted "its judgment as to the existence of preference for that of the Commission on the ground that where there was no dispute as to the facts it had a right to do so, [the court] obviously exerted an authority not conferred upon it by the statute." [15] So here, it has been pointed out that there was no dispute in the evidence before the Commission, all of which was introduced by respondents. But the differing inferences as to discrimination finding possible support in that evidence are made to stand out by the persuasive reasoning advanced in both the majority and minority opinions of the Commission. The Interstate Commerce Act does not attempt to define an unlawful discrimination with mathematical precision. Instead, different treatment for similar transportation services is made an unlawful discrimination when "undue," "unjust," "unfair," and "unreasonable." And the courts have always recognized that Congress intended to commit to the Commission the determination, by application of an informed judgment

---

[14] *United States* v. *Louisville & Nashville R. Co.*, 235 U. S. 314, 320.

[15] *Id.*

to existing facts, of the existence of forbidden preferences, advantages and discrimination.[16]

A special allowance to a forwarder as an inducement to ship goods by a particular carrier would be an illegal rebate.[17] Similarly, and as previously pointed out, forwarders are shippers protected by the Interstate Commerce Act from discrimination by carriers.[18] As shippers, forwarders do business subject to the paramount principle that Congress intended our national transportation system to operate without favoritism. Pursuant to its duty to apply that principle upon a national scale, the Commission can prevent unjust rate discrimination by carriers against other shippers and in favor of forwarders. The particular problem here involved is but a segment of the larger complicated national problem of rates with which the Commission must deal. As exemplified by this record, the Commission is "informed by experience" [19] of years in its consideration of the relationship of forwarders to our national transportation system.

The fact that the Commission acted on its motion without complaints by individual shippers did not detract

---

[16] *Swayne & Hoyt, Ltd.* v. *United States,* 300 U. S. 297, 304; *Interstate Commerce Comm'n* v. *Delaware, L. & W. R. Co., supra,* at 255; *Manufacturers Ry. Co.* v. *United States,* 246 U. S. 457, 481. *Texas & Pacific Ry. Co.* v. *Interstate Commerce Comm'n,* 162 U. S. 197, represents an apparent exception, at an early date before the function of the Commission had become fully outlined against the background of time and the empiric pattern of litigation. (Commission's bill to enforce its holding that the difference between domestic and imported merchandise could not justify different rates between the port of reception and point of delivery, ordered dismissed).

[17] *Lehigh Valley R. Co.* v. *United States,* 243 U. S. 444.

[18] *Interstate Commerce Comm'n* v. *Delaware, L. & W. R. Co., supra,* at 255.

[19] Cf. *Standard Oil Co.* v. *United States,* 283 U. S. 235, 239; *Illinois Central R. Co.* v. *Interstate Commerce Comm'n,* 206 U. S. 441, 454.

from the Commission's power to protect and maintain a transportation system free from partiality to particular shippers. The Commission acted in its capacity as a public agency and carried out duties imposed upon it by Congress in the interest of shippers generally, the national transportation system and the public interest.[20] Its order was the embodiment of the Commission's judgment that the proposed tariff was a discrimination prohibited by the Act. "The judgment so exercised, being supported by ample evidence, is conclusive." [21]

The judgment of the court below is reversed and the bill is ordered dismissed.

*Reversed.*

---

[20] Cf. *Inland Steel Co.* v. *United States,* 306 U. S. 153, 157.

[21] *United States* v. *Illinois Central R. Co.,* 263 U. S. 515, 525, 526.