## SOUTHERN RY. CO. v. ACME FAST FREIGHT, Inc.

### No. 7694.

United States Court of Appeals for the District of Columbia.

Argued May 15, 1941.

Decided Nov. 10, 1941.

Mr. Seddon G. Boxley, of Washington, D. C. with whom Messrs. George E. Hamilton, John J. Hamilton, George E. Hamilton, Jr., and Henry R. Gower, all of Washington, D. C., were on the brief, for appellant.

Mr. George D. Rives, of Washington, D. C. with whom Mr. Jack R. Turney, Jr., of Washington, D. C., was on the brief, for appellee.

Before VINSON, EDGERTON, and RUTLEDGE, Associate Justices.

EDGERTON, Associate Justice.

Appellee, Acme Fast Freight, Inc., a freight forwarder, sued appellant, the Southern Railway Company, to recover five cents per hundred pounds on freight shipped by Acme from Southern's freight station at High Point, North Carolina. Under a license or lease from Southern, Acme occupied certain space in that station, for which it paid rent, and carried on its business there. Part of this space was enclosed by a partition. Southern picked up Acme's freight, either from this space or from adjoining space, and loaded it on cars.

The controversy turns on the meaning of Southern's "Pick-Up and Delivery Tariffs." Two such were successively in effect, but the differences between them are not material here. The earlier contained these terms: "Pick up service as defined in Item 20 will be performed * * * without additional charge above the tariff rate * * * or in lieu thereof an allowance as provided in Item 210 will be made to consignor who elects to make his own arrangements for delivery to carrier's freight depot * * *. Item 20. Subject. Definition of Terms. The term 'Pick-Up Service,' as used in this tariff, *refers to the service of the carrier involved in* calling for and *collecting freight,* and receipting therefor, from a dock, platform, or doorway directly accessible to highway vehicles, *at consignor's warehouse, factory, store, or similar place of business; and includes transportation therefrom to the premises of the carrier's freight depot* * * *. Item 210 * * * *When the consignor elects to make his own arrangements for the Pick-Up Service authorized herein, an allowance* of 5 cents per 100 pounds *will be made to such consignor for such service* * * *. Said allowance* will be made only on shipments which are delivered and unloaded by the consignor on carrier's freight depot platform or in carrier's freight depot, and receipted for by the carrier at the freight depot located on or served by the tracks of said carrier."[1]

If Southern had offered alternative rates, a lower rate for shipments delivered to it at its station and a higher rate for shipments delivered to it elsewhere, Acme would probably have been entitled to the lower rate. But that is not this case. Instead, Southern offered to perform a pick-up service, authorized shippers to perform this service in its behalf, and promised an allowance to those who did so. "Said allowance", in the last sentence quoted, clearly refers to the foregoing "allowance * * * for such service"; i.e., for "transportation

---

[1] Italics supplied.

\* \* \* to the \* \* \* carrier's freight depot" from the "consignor's \* \* \* place of business."[2] By ignoring the word "said", Acme seeks to treat the sentence in question as cancelling the limitations which precede it. Instead, it incorporates them. In the circumstances of this case, no one performed or could perform the transportation service for which the allowance was offered, for the simple reason that the consignor's place of business was in the "carrier's freight depot." This disposes of the claim in suit. The fact that Southern did not perform the service is immaterial. Since Acme did not perform it, payment of the allowance to Acme is neither required nor permitted by any provision of the published tariff, to which tariff the carrier must conform.

This result is as fair as it is lawful. If Acme had rented quarters outside the station, it could have chosen between two alternative methods of getting its goods on board without cost to itself. It might have required Southern to collect them, or it might have hauled them to the station and received the allowance. By renting quarters within the station Acme got the goods on board, without cost to itself, by a third method. This puts it on a par with other shippers. It is here seeking to obtain, in addition, the benefit of the second method without its cost. If it succeeded, it would obtain an advantage over other shippers.[3] They either, like Acme, perform no service for Southern and receive no allowance, or, unlike Acme, perform Southern's pick-up service at their own expense.

I concur in the additional views of Judge RUTLEDGE.

Reversed.

RUTLEDGE, Associate Justice (concurring).

I concur in the opinion of my brother Edgerton. The crucial question is whether the allowance is due under the tariff for part of the transportation service, the "pick-up," only when the shipper performs it or simply when the railroad does not perform it. Is it payable for something the shipper does or merely for something the carrier does not do? Ordinarily these are just different ways of saying the same thing. The shipper does exactly what the carrier is relieved from doing, and receives the allowance for doing it. But because the shipper's premises are in the railroad station here, neither does or can do the pick-up service.

Is such a situation one in which the railroad intended to offer the allowance? I think a negative answer is required both by the language and by the basic purpose of the tariff provisions. I cannot regard the provisions for the allowance as distinct and independent from those for the service, as my brother Vinson seems to do. They are intended to apply in identical situations and with identical limitations, except that in one the carrier does the work, in the other the shipper does it. Both contemplate that pick-up service shall be done, neither that it shall not be done. And pick-up service means not merely receipting for the goods in the station, but physically transporting them from the shipper's premises to the station.[1] This necessarily means that the premises must be located at some distance from the station, not within it.

That the provision for allowance contemplates rendition of the service, i.e., some actual transportation of the goods, appears not only from the words "said allowance" in Item 210, but also from its language, "when the consignor elects to make his own arrangements *for the Pick-Up Service authorized herein*," and "an allowance \* \* \* will be made to such consignor *for such service*." It is not any arrangement which the consignor may make which entitles him to the allowance. It is only his arrangement "for the Pick-Up Service authorized herein." The only service authorized is that defined in Item 20, which by explicit wording "includes *transportation*" from the shipper's premises to the station. Furthermore, Item 10 expressly makes the allowance a substitute for rendition of the service by the carrier: "Pick-up service will be performed \* \* \* without additional charge \* \* \* or *in lieu thereof* an allowance will be made \* \* \*." And it is made to the consignor

---

[2] We need not decide whether, as is perhaps implied, this transportation must be by "highway vehicles". Cf. Pick-Up and Delivery in Official Territory, 218 I.C.C. 441, 446, 471.

[3] Cf. United States v. Chicago Heights Trucking Co., 310 U.S. 344, 60 S.Ct. 931, 84 L.Ed. 1243.

[1] Cf. Pick-Up and Delivery in Official Territory, 1936, 218 I.C.C. 441; also Constructive and Off-Track Railroad Freight Stations, 1929, 156 I.C.C. 205, 208; Motor Bus and Motor Truck Operation, 1928, 140 I.C.C. 685, 729; New York Dock Ry. v. Pennsylvania R. Co., 3 Cir.1933, 62 F.2d 1010.

who makes "his own arrangements *for delivery* to carrier's freight depot." In my view, this clause cannot be disconnected from all the remaining language of the tariff provisions and made effective to dispense with the actual transportation which they clearly contemplate as the condition for allowance. The word "arrangements" is qualified by "for delivery *to* the carrier's freight depot," and the word "delivery" means, consistently with all other provisions of the tariff and common usage, transportation *to* the station. This single clause of Item 10 is not and was not intended to be contradictory to all other provisions of the pertinent items of the tariff. Those provisions clearly define pick-up service as transportation and the definition is not mere "advertising." It is the essence of the service offered by the carrier and equally of the service which, *when performed* by the shipper, gives him the right to the allowance.

The matter may be tested best, perhaps, by the basic purpose of the provisions for pick-up service and for the allowance. It may be put this way. If the situation which this case presents had been the only one confronting the carrier, it is safe to say neither the provisions for pick-up service nor those for allowance in lieu of it ever would have appeared in the tariff. The situation is not one which they were designed or intended to cover. Their purpose was to enable the railroad to meet automotive competition.[2] Motor transport had the advantage in hauling from door to door. Railroads hauled only from station to station. It was the haul from shipper's door to station and from station to consignee's door which put the railroads at disadvantage, and to reduce this the provisions for pick-up and delivery service, including allowance when done by the shipper, were included in the tariff. The provisions for allowance were an integral part of the entire plan and there would have been no reason or occasion for them if there had been none for tendering the service. In other words, the allowance would not have been offered if the service had not been offered, and it was designed to apply in the identical situations in which the service was tendered, differing only in giving the shipper the option to do the work. Clearly it was not intended to dispense with the work altogether.

To apply the provisions for allowance in the facts of this case, therefore, would pervert both their language and their purpose. In these circumstances, with the shipper's premises in the station, the railroad had the competitive advantage of the motor carriers. The shipper's very purpose in locating his premises there was to use the railroad's shipping facilities, not those of motor carriers. The situation is exactly the converse of that which the tariff provisions, whether for service or for allowance, were intended to cover.

It may be added that requiring the shipper to perform the service before receiving the allowance is at least a safeguard against its being held a rebate or an unlawful discrimination. He gives quid pro quo—service for allowance.[3] It is, however, unnecessary to decide whether the allowance, without performance of the service, would be unlawful.

VINSON, Associate Justice (dissenting).

I agree with the majority that the only issue in this case is the interpretation of Southern's tariffs.

Railroads by their physical set up were long regarded as station to station carriers. The public's demand for more and more service, and the competition from other forms of transportation, led the railroads to experiment in pick-up and delivery service for less than carload shipments. At the time of these experiments it was clear that

[2] Cf. authorities cited supra note 1.

[3] That allowances or rebates can be paid lawfully only for services actually performed by the shipper in connection with the transportation and defined in or pursuant to statute, see United States v. Chicago Heights Trucking Co., 1940, 310 U.S. 344, 60 S.Ct. 931, 84 L.Ed. 1243; Merchants' Warehouse Co. v. United States, 1931, 283 U.S. 501, 51 S.Ct. 505, 75 L.Ed. 1227; Lehigh Valley R. R. v. United States, 1917, 243 U.S. 444, 37 S.Ct. 434, 61 L.Ed. 839; United States v. Baltimore & O. R. Co., 1913, 231 U.S. 274, 34 S.Ct. 75, 58 L.Ed. 218; Mitchell Coal & Coke Co. v. Pennsylvania R. R., 1913, 230 U.S. 247, 33 S.Ct. 916, 57 L.Ed. 1472; Union Pacific R. R. v. Updike Grain Co., 1911, 222 U.S. 215, 32 S.Ct. 39, 56 L.Ed. 171; New York Dock Ry. v. Pennsylvania R. Co., 3 Cir., 1933, 62 F.2d 1010; United States v. Interstate Commerce Commission, 1921, 51 App.D.C. 136, 277 F. 538; Freight Forwarding Investigation, 1938, 229 I.C.C. 201, 215, 304; Pick-Up and Delivery in Official Territory, 1936, 218 I.C.C. 441, 445, 446, 471, 472, 481; Tariffs Embracing Motor-Truck or Wagon Transfer Service, 1924, 91 I.C.C. 539, 547.

the law of the land did not require the railroads to be more than station to station common carriers. Later it became clear that it was lawful for the railroads to hold out pick-up and delivery service, and lawful, moreover, to make allowances to consignors and consignees who wanted to handle their own goods to or from the station.

The Southern Railway Company held out pick-up and delivery service with provision for an allowance. Acme, as a consignor, seeks the allowance. The only reason that any dispute arises is that Acme, instead of being an ordinary shipper, is a freight forwarder with its place of business in the railway station.

A freight forwarder is an institution which simply takes advantage of the fact that a railroad is at its best with big carloadings whereas many shippers send small packages. The forwarder collects the small articles, becomes the consignor on a large shipment over the rails, and breaks down the consignment at the destination point.

By Southern's tariffs, when is a consignor entitled to the allowance? "When * * * [he] elects to make his own arrangements for the Pick-Up Service authorized herein * * *." What must he be sure to do when he makes his own arrangements? "Said allowance will be made only on shipments which are delivered and unloaded by the consignor * * * in carrier's freight depot."

At the trial and on argument here, counsel stressed the issue of whether the packages in Acme's leased portion of the premises and nearby, where Southern obtained them for loading, were in carrier's freight depot within the meaning of the tariff. The court is in unanimity that the goods were within carrier's freight depot.

The majority holds, nonetheless, that Acme is not entitled to the allowance because the phrase "said allowance" incorporates the limitations in the words "such service" in the preceding sentence of the same Item (210). "Such service" is pick-up service, which is described in another Item (20): "The term 'Pick-Up Service' as used in this tariff, refers to the service of the carrier involved in calling for and collecting freight, and receipting therefor, from a dock platform, or doorway directly accessible to highway vehicles, at consignor's * * * place of business; and includes transportation therefrom to the premises of the carrier's freight depot * * *". (Italics supplied.)

It is clear to me that Item 20 is drawn from the viewpoint of the carrier performing the service. It implies, for example, that the carrier is going to use a highway vehicle. There is no requirement that the consignor do the pick-up service like the carrier would. In fact the important language in Item 210 offering the allowance, "when the consignor elects to make his own arrangements", negatives the idea that he must imitate the carrier's method of performing the Pick-Up. I presume, therefore, that if a consignor were to carry a hundred pound sack on his back and slip it off in the carrier's depot, he would have performed the "Pick-Up Service".

The words of art that the majority stress in the Pick-Up definition are: "and includes transportation * * * [from the consignor's place of business] to * * * the carrier's freight depot." There can not be transportation in the usual sense here because of the physical set up; but this bit of "advertising" on the part of the railroad as to what it will do when it performs the pick-up service should not blind us to the fact that here the freight stands unloaded in the carrier's depot as per the real requirement for the allowance. When the whole nature of railroad transportation is kept in the limelight rather than particular words of the tariff emphasized, it can be easily understood why the crucial factor in granting the allowance is that the freight be in the carrier's depot ready for car loading. The railroad operates primarily a station to station system of transportation. It has broadened its service and increased its expense with pick-up and delivery. Hence, when a consignor chooses not to use the extended service and requests the refund, the carrier insists that the freight be in its station and there in such a way that its station to station transportation can work as efficiently as it did before it ever broadened its service. And when the freight is there and is ready for car loading, how it got there is immaterial. All the railroad need know is that the consignor made his own arrangements rather than having it perform the service. The railroad is being called upon for only station to station transportation. This consignor should receive the allowance the same as any other.

Item 210 which grants the allowance contains the important language in determining whether an allowance should be granted. The allowance is to be given to all who make their own arrangements for Pick-Up Service. In reality then, when the

consignor has made his own arrangements, and the goods are ready for the railroad's station to station transportation, the Pick-Up Service has been performed. How it was done I know not. That it was done is clear. I cannot, therefore, make the assumption of my brethren that Acme did no work.

The majority concede that if Southern offered alternative rates Acme would probably be entitled to the lower. There is no need to be overnice concerning words; it can be said that in effect two rates are offered. The Interstate Commerce Commission in the case referred to by the majority (footnote 2) certainly considered the net effect of the allowance. Perchance it would have been better to post two sets of rates after further study as Commissioner Eastman suggested. The course followed, however, was the adoption of tariffs like the one now before us.

The majority's statement that if Acme receives the allowance it will have an advantage over all other shippers is a conjectural conclusion. What are Acme's operating costs? What does it pay for the average shipment? What does Acme charge its patrons? These matters are not of record, nor are they relevant. The allowance is not predicated upon consignor cost. It is a flat rate for all who make their own arrangements. We do not know how Acme made its own arrangements but we know that it did.

The trial court's conclusion of law that Acme "elected to make and did make its own arrangements for the pick-up service authorized by the tariffs of the defendant" should be affirmed.