UNIVERSAL CARLOADING & DISTRIBUTING COMPANY, INC., Plaintiff-Appellant, v. CHIPPEWA MOTOR FREIGHT, INC., Defendant-Respondent.

Supreme Court

*No. 77–018. Submitted on briefs September 12, 1979.— Decided October 9, 1979.*
(Also reported in 284 N.W.2d 79.)

For the appellant the cause was submitted on the briefs of *Wilcox & Wilcox* of Eau Claire.

For the respondent the cause was submitted on the brief of *Benjamin D. Proctor* and *Hibbard, Proctor & Schrage* of Eau Claire; and *James L. Nelson* of St. Paul, Minnesota.

COFFEY, J. This is an appeal from a judgment of the circuit court for Eau Claire county dismissing an action of indemnification for loss of merchandise in transit.

The plaintiff-appellant, Universal Carloading & Distributing Co., Inc. (hereinafter called Universal), is a foreign corporation doing business in Wisconsin as a freight forwarder and thus specializes in the handling and transfer of freight in quantities of less than a rail carload or truckload. The business of freight forwarding was described in *Acme Fast Freight v. United States,* 30 F. Supp. 968, (1940) as follows:

"The forwarding companies collect, consolidate, ship and distribute less-than-car-load lots of freight and express shipments throughout the entire United States, utilizing the services of carriers by motor vehicle, rail and water, . . . .

"The basic principle underlying the operations of the companies is the concentration of numerous individual small shipments within the shortest possible distances so that the economy and expedition obtainable by handling consolidated carload lots by rail or water and truckload quantities by motor may be gained for the larger part of the haul. Shipments assembled at applicants' smaller stations are generally moved by the shortest possible routes to or through key stations and to local stations by their own local vehicles or by railroads, steamships or motor vehicles operated by others. The choice of the carriers utilized always rests with the forwarding

companies and not with the shipper. The forwarders use only motor carriers which they believe have complied with the requirements of the Act.

"In addition to the movement of less-than-carload traffic at rates per pound and per hundred pounds, a package division handles parcels in expedited service at pound rates in consolidated shipments. Commodities in bulk like grain, oil, coal, sand, iron and steel are not accepted for shipment. Traffic ordinarily is handled from the premises of the shipper to the premises of the receiver. Where collection service is provided, the shipper notifies the nearest agent of the forwarding companies and receipts for the goods by either a bill of lading of the forwarding company or an interim receipt which later is exchanged for such a bill of lading. At times collection service at point of origin is not performed by the forwarder's carrier, although it is generally available and specified in the forwarder's tariffs. In such cases, the forwarder's custody of the goods begins at its receiving station instead of at shipper's premises.

"The individual shipments are consolidated by the forwarding company into carload or truck-load lots for transportation by either rail, steamship or motor, depending upon which will provide the desired service to points at which are located the forwarding companies' destination or distribution stations, in the case of goods going direct to such points, or to intermediate concentration stations, as break-bulk or transfer points, where shipments are to go beyond. In the latter instances, resorting and reconsolidation occur before further shipment to ultimate destination. Motor movements are under way bills of the forwarding company, but bills of lading, issued by Acme Fast Freight, Inc., accompany the shipments to the destination stations and the forwarding company receives from the motor carrier a receipt for the property transported. Railroads and water carriers use their own billing for their portion of the hauls, apart from forwarder's billing. There is no contractual relation between the shipper and the actual carrier. Generally the shipper does not know the carrier, other than the forwarder, by which its goods are to be transported or whether its shipment will be transported

by a motor, rail or water carrier, or some combination thereof." *Id.* at 969–70.

The defendant-respondent, Chippewa Motor Freight, Inc. (hereinafter called Chippewa), is a Wisconsin corporation engaged in the business of transferring freight in interstate commerce as a motor carrier.[1]

Universal and Chippewa entered into a contract pursuant to sec. 409(a) of the Interstate Commerce Act for the forwarding and carriage of freight. The service contract was effective December 15, 1955 and contained the following indemnification clause:

"**2. Liability:** Motor carrier shall assure and indemnify forwarder against liability arising by, in, or incident to the performance by motor carrier of any of the services provided for by this contract and for all shipments while in its possession, or because of any failure, delay or omission of motor carrier and shall assume pro rata liability for unlocated loss or damage to shipments. Motor carrier shall maintain policies of insurance adequate to indemnify forwarder against liability as defined herein. *Provided, however,* That the liability of motor carrier shall in no way be limited by such policies of insurance."

The general indemnification clause in the service contract contained no time limit as to when claims must be filed by the forwarder with the motor carrier.

Pursuant to the service contract, Universal, acting as a freight forwarder, placed its customer's goods and merchandise in the motor carrier's, Chippewa's, hands for transfer and shipment to specified destinations. It is alleged that during the period from June, 1969 through February, 1971, the defendant, Chippewa, lost certain items of freight while in transit. The customers of Universal, whose freight had been lost, made claim against

---

[1] Motor carrier is defined in 49 USCA, §303(16) as including both common carriers by motor vehicle and contract carriers by motor vehicle.

Universal in accordance with the bills of lading issued by Universal for the value of the lost freight.

After investigating the claims Universal made payment to its customers for the reasonable value of the lost freight. Following its payment of the claims, Universal sought reimbursement from the motor carrier, Chippewa. It is undisputed that as to all the claims involved in this action Universal failed to file its claims with Chippewa within the 9-month limit specified in the bill of lading contract. Thus Chippewa refused to pay the claims. Universal then brought suit against Chippewa in the circuit court for Eau Claire county with the filing of a summons and complaint on April 26, 1976 alleging that:

". . . the defendant is indebted to the plaintiff on said claims in the total amount of Six Thousand Eight Hundred Nine Dollars and Sixty-Nine Cents ($6,809.69), together with interest thereon and costs and disbursements herein."

The defendant, Chippewa, in its answer interposed a general denial reciting:

1. that it had not breached its contract of carriage or lost any merchandise left in its custody for transfer and shipment; and

2. Chippewa further alleged that Universal's claim against it was not timely filed within nine months after delivery or within nine months after a reasonable time for delivery had elapsed.

A hearing on the issue relating to the time limitation, if any, for filing damage claims was heard and on March 21, 1977 the court in a written memorandum decision and order held as follows:

"I therefore conclude that the Acme case is still the law and that its holding applies to motor vehicle common carriers as well as railroads even though there be a contract of indemnification between the forwarder and the motor vehicle common carrier which is filed with the

Commission pursuant to sec. 409 of the Act. In the absence of specific contract provisions abrogating the nine month claim filing requirement in the Uniform Bill of Lading, that requirement, being a part of the total contractual relationship, applies to the forwarder and that the forwarder, standing in the position of a shipper in its relationship to the motor carrier, has no right-over under sec. 20 (12).

"ACCORDINGLY, IT IS HEREBY ORDERED, that the defendant shall, within 20 days of the receipt of this decision, prepare a suitable order or judgment pursuant to the determinations made in this decision."

A formal judgment dismissing the action was entered May 19, 1977. From this judgment Universal appeals.

The appellant, Universal, contends that its service contract with Chippewa, providing for indemnification for freight losses, entered pursuant to sec. 409 (a) of Interstate Commerce Act, is controlling in this case rather than the United States Supreme Court's ruling in *Chicago, Milwaukee, St. Paul & Pacific Railroad Company v. Acme Fast Freight, Inc.*, 336 U.S. 465, 69 S. Ct. 692, 93 L. Ed. 817 (1949) because:

1. subsequent to the Court's decision in *Acme*, Congress changed the law ". . . in respects which had been considered controlling by the Supreme Court in its decision"; and

2. ". . . the facts in the *Acme* Case differ materially from the facts at issue here. . .".

Since *Acme* does not apply appellant relies on 49 USCA, §1002 (a) (5),[2] which defines freight forwarders

---

[2] "(5) The term 'freight forwarder' means any person which (otherwise than as a carrier subject to chapters 1, 8 or 12 of this title) holds itself out to the general public as a common carrier to transport or provide transportation of property, or any class or classes of property, for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for

as common carriers, and 49 USCA, §1013,[3] which makes
49 USCA, §20(11)[4] and (12)[5] (also known as the

the performance of break-bulk and distributing operations with
respect to such consolidated shipments, and (B) assumes responsi-
bility for the transportation of such property from point of receipt
to point of destination, and (C) utilizes, for the whole or any part
of the transportation of such shipments, the services of a carrier
or carriers subject to Chapters 1, 8, or 12 of this title."

[3] "1013. **Bills of lading and delivery of property.** The provi-
sions of section 20(11) and (12) of this title, together with such
other provisions of this title (including penalties) as may be
necessary for the enforcement of such provisions, shall apply with
respect to freight forwarders, in the case of service subject to this
chapter, with like force and effect as in the case of those persons
to which such provisions are specifically applicable, and the freight
forwarder shall be deemed both the receiving and delivering
transportation company for the purposes of such section 20(11)
and (12) of this title. When the services of a common carrier by
motor vehicle subject to chapter 8 of this title are utilized by a
freight forwarder for the receiving of property from a consignor
in service subject to this part, such carrier may, with the consent
of the freight forwarder, execute the bill of lading or shipping
receipt for the freight forwarder. When the services of a common
carrier by motor vehicle subject to chapter 8 of this title are
utilized by a freight forwarder for the delivery of property to the
consignee named in the freight forwarder's bill of lading, shipping
receipt, or freight bill, the property may, with the consent of the
freight forwarder, be delivered on the freight bill, and receipted
for on the delivery receipt, of the freight forwarder."

[4] "(11) **Liability of initial and delivery carrier for loss—Limita-
tion of liability—Notice and filing of claim.** Any common carrier,
railroad, or transportation company subject to the provisions of this
chapter receiving property for transportation from a point in one
State or Territory or the District of Columbia to a point in another
State, Territory, District of Columbia, or from any point in the
United States to a point in an adjacent foreign country shall issue
a receipt or bill of lading therefor, and shall be liable to the
lawful holder thereof for any loss, damage, or injury to such
property caused by it or by any common carrier, railroad, or
transportation company to which such property may be delivered
or over whose line or lines such property may pass within the
United States or within an adjacent foreign country when trans-

CARMACK AMENDMENT), applicable to freight forwarders. Appellant contends since freight forwarders are common carriers then 49 USCA, §20 (12) gives ported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed; and any such common carrier, railroad, or transportation company so receiving property for transportation from a point in one State, Territory, or the District of Columbia to a point in another State or Territory, to a point in the District of Columbia, or from any point in the United States to a point in an adjacent foreign country, or for transportation wholly within a Territory, or any common carrier, railroad, or transportation company delivering said property so received and transported shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is hereby declared to be unlawful and void: Provided, That if the loss, damage, or injury occurs while the property is in the custody of a carrier by water the liability of such carrier shall be determined by the bill of lading of the carrier by water and by and under the laws and regulations applicable to transportation by water, and the liability of the initial or delivering carrier shall be the same as that of such carrier by water: Provided, however, That the provisions hereof respecting liability for full actual loss, damage, or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply, first, to baggage carried on passenger trains or boats, or trains or boats carrying passengers; second, to property, except ordinary livestock, received for transportation concerning which the carrier

freight forwarders the right to recover from connecting carriers such as Chippewa on whose line the loss or damage occurred without any time limitations as to when the claims may be filed.

shall have been or shall hereafter be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released, and shall not, so far as relates to values, be held to be a violation of section 10 of this title; and any tariff schedule which may be filed with the commission pursuant to such order shall contain specific reference thereto and may establish rates varying with the value so declared and agreed upon; and the commission is hereby empowered to make such order in cases where rates dependent upon and varying with declared or agreed values would, in its opinion, be just and reasonable under the circumstances and conditions surrounding the transportation. The term 'ordinary livestock' shall include all cattle, swine, sheep, goats, horses, and mules, except such as are chiefly valuable for breeding, racing, show purposes, or other special uses: Provided further, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law: Provided further, That all actions brought under and by virtue of this paragraph against the delivering carrier shall be brought, and may be maintained, if in a district court of the United States, only in a district, and if in a State court, only in a State through or into which the defendant carrier operates a line of railroad: Provided further, That it shall be unlawful for any such receiving or delivering common carrier to provide by rule, contract, regulation or otherwise a shorter period for the filing of claims than nine months, and for the institution of suits than two years, such period for institution of suits to be computed from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice: And provided further, That for the purposes of this paragraph and of paragraph (12) the delivering carrier shall be construed to be the carrier performing the line-haul service nearest to the point of destination and not a carrier performing merely a switching service at the point of

On the other hand, the respondent, in its brief, argues that *Acme* is still controlling and therefore:

". . . As decided in *Acme*, a forwarder is a shipper in its relations with the carriers used to transport its freight rather than a connecting line, is bound by the nine month limitation in the bill of lading for filing claims, and that the right-over against connecting lines in section 20 (12) is not applicable to freight forwarders. A forwarder is bound by the nine month limitation for filing claims contained in the carrier's bill of lading the same as any other shipper."

*ISSUE*

Is a freight forwarder who has paid freight claims to its customers required to file its claims for indemnification within the nine month time period specified in the bill of lading or is the indemnification clause in their service contract controlling?

The United States Supreme Court in *Chicago, Milwaukee, St. Paul & Pacific Railroad Company v. Acme Fast Freight, Inc., supra,* dealt with the question of whether a freight forwarder, such as Universal, must file its claims for indemnification for payment of lost freight claims within the nine-month period specified in the

destination: And provided further, That the liability imposed by this paragraph shall also apply in the case of property reconsigned or diverted in accordance with the applicable tariffs filed as in this chapter provided."

[5] "(12) **Recovery by initial carrier from connecting carrier.** The common carrier, railroad, or transportation company issuing such receipt or bill of lading, or delivering such property so received and transported, shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained, the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof, and the amount of any expense reasonably incurred by it in defending any action at law brought by the owners of such property."

motor carrier's contractual agreement—the bill of lading. The court in that case held that freight forwarders do not have a right-over[6] against connecting carriers under sec. 20(12) of the Interstate Commerce Act (49 USCA, §20(12)), but are limited only to those rights contained in the bill of lading issued under sec. 20(11) of the Interstate Commerce Act (49 USCA, §20(11)).

However, the appellant has attemped to distinguish this court decision in the following manner.

*Subsequent Amendment of USCA, §1002(a)(5)*

Appellant cites the fact that following the court's decision in *Acme* Congress amended the definition of *freight forwarder* in 49 USCA, §1002(a)(5) by adding the words ". . . as a common carrier . . ." following the phrase ". . . general public . . .", 64 Stats., 1113 (1950), as evidence of Congress' intention to eliminate the dual status previously attributed to freight forwarders, such as Universal. Prior to the amendment the statutory definition read as follows:

"The term 'freight forwarder' means any person which . . . holds itself out to the general public to transport or provide transportation of property, for compensation, in interstate commerce, and which in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and (B) assumes responsibility for the transportation of such property from point to receipt to point of destination, and (C) utilizes for the whole or any part of the transportation

---

[6] The right-over under 49 USCA, §20(12) is the right of a common carrier, who has paid a claim for lost or damaged goods for which another carrier is responsible, to recover the amount of the claim from the responsible carrier on the basis of subrogation.

of such shipments, the services of a carrier or carriers subject to Part I, II, III of this Act."

The amendment, appellant contends, gave freight forwarders the status of a common carrier, both in its dealings with its customers (shippers of less than truckload amounts) and underlying common carriers, and thus a freight forwarder would have a right-over against a motor carrier under 49 USCA, §20 (12) without being limited to a nine-month period on filing claims.

The amendment of 49 USCA, §1002 (a) (5), to which appellant refers, was never intended to change or modify the status or relationship between a freight forwarder and a common carrier but rather it was intended to clarify the freight forwarder's relationship with its own customers. To support this conclusion we rely on the following:

1. The House Committee Report, No. 2489, 81st Congress, 2nd Session, p. 4223, which accompanied the amendment bill. This report indicates that the amendment was not intended to change the status of freight forwarders:

". . . to describe freight forwarders as common carriers, as the amendment made by the first section of this bill proposes to do, does not change the status which they have always had, but simply recognizes that status by statutory law. This will remove any anomaly and confusion regarding the status of freight forwarders and make clear that they have the status of common carriers."

2. The amended definition of a freight forwarder, as set forth in 49 USCA, §1002 (a) (5). The amendment establishes that a freight forwarder is one who holds himself out to the *general public as a common carrier* able to transport or provide transportation. Thus the specific language of the statute makes it clear that freight forwarders have the status of a common carrier in their

relationship with the general public, their likely customers, and not with an underlying common carrier.

3. Recent court decision also indicate that the 1950 amendment of 49 USCA, §1002(a)(5) has not changed the freight forwarder's status as shipper in its relationship with common carriers as was held in *Acme*.

In 544 F.2d 919 (1976) the court held that Couzens was acting in the capacity of a freight forwarder and thus it had the status of a shipper when dealing with Olson Motor Service, a common carrier. The issue was whether Couzens had the status of a shipper and was therefore entitled to special rates. Olson Motor Service was an interstate motor vehicle common carrier and Couzens operated public warehouses in the Chicago area. Couzens utilized Olson Motor Service to ship goods from its Chicago warehouse to Milwaukee. The United States Court of Appeals, 7th Circuit, held that Couzens was acting as a freight forwarder in its dealings with Olson Motor Service, pursuant to the provisions of the Interstate Commerce Act. In this case the court reasoned that:

". . . Had Couzens been a licensed freight forwarder, it would be undisputed that it must be considered a shipper insofar as its relationship with Olson, a carrrier, is concerned. *Chicago, Milwaukee, St. Paul, & Pacific Railroad Co. v. Acme Fast Freight, Inc.*, 336 U.S. 465, 69 S. Ct. 692, 93 L. Ed. 817 (1949). The lack of an appropriate permit does not change the nature of Couzens' activities nor its relationship with Olson. In fact, forwarders were considered shippers insofar as their relationships with carriers were concerned long before forwarders came under the regulation of Part IV of the Interstate Commerce Act, and the Act did not alter this relationship. *Id.* at 476, 69 S. Ct. 692. Couzens must therefore be considered a 'shipper' within the meaning of the applicable tariffs." *Couzens Warehouse & Distributors, Inc. v. Fred Olson Motor Service Co.*, 544 F.2d 919, 921 (1976).

In *Season-All Industries, Inc. v. Merchant Shippers,* 417 F. Supp. 998 (1976) the Federal Court of the Western District of Pennsylvania cited the *Acme* decision as holding that ". . . although freight forwarders were treated as initial carriers in relationship to the owner-shipper of the goods, as to other carriers they were still to be treated as shippers." *Id.* at 1004. Therefore, the court concluded that Merchant Shipper, as a freight forwarder, occupied the position of a shipper in its dealings with Breman's Express, a motor truck common carrier, while at the same time occupying the position of initial carrier in its relationship with Season-All.

In *N. Y. Foreign Freight, ETC. v. I.C.C.,* 589 F.2d 696 (1978), the United States Court of Appeals, D. C. Circuit, held that:

". . . freight forwarders possess dual qualities: they have the quality of a common carrier in relation to their shippers, and the quality of a shipper in relation to the underlying carriers. The history of regulation of freight forwarders has been influenced by a certain tension between these two qualities." *Id.* at 700.

The court, in that case, also discussed the history of the Freight Forwarder's Act and its effect on the law in the following language:

"In 1942, Congress enacted the Freight Forwarders Act, which became Part IV of the Interstate Commerce Act and which brought freight forwarders under federal regulation. Freight forwarders were not, however, expressly characterized as common carriers, and except for a few narrowly defined circumstances they were not given authority to enter into joint rates with domestic carriers. In *Chicago, M., St. P. & Pac. R. Co. v. Acme Fast Freight, Inc.,* 336 U.S. 465, 69 S. Ct. 692, 93 L. Ed. 817 (1949), the Supreme Court held that the Freight Forwarders Act did not alter the basic status of freight forwarders as shippers in relation to the underlying carriers.

"Congress amended Part IV in 1950, using words that expressly recorded the status of freight forwarders as

common carriers. However, the accompanying committee report stated that the amendment was not intended to modify the current state of the law. Further, the committee expressed the view that nothing in the amendment would permit joint rates between freight forwarders and domestic carriers. At least implicitly, the committee accepted the freight forwarders' dual qualities." *Id.* at 700–01.

Finally, in the case of *Belland v. American Automobile Ins. Co.,* 101 A.2d 517 (1953), the Municipal Court of Appeals, D. C., held:

". . . Universal is admittedly a freight forwarder. The customary function and status of such forwarders have been discussed in two recent Supreme Court decisions. *U. S. v. Chicago Heights Trucking Co.,* 310 U.S. 344, 60 S. Ct. 931, 84 L. Ed. 1243; *Chicago, M., St. Paul & Pac. R. Co. v. Acme Fast Freight,* 336 U.S. 465, 69 S. Ct. 692, 93 L. Ed. 817. In the second of these two cases, 336 U.S. at page 467, 69 S. Ct. at page 693, Chief Justice Vinson pointed out: 'The forwarder thus has some of the characteristics of both carrier and shipper. In its relations with its customers, a forwarder is subjected by the Act to many of the requirements and regulations applicable to common carriers . . . . In its relations with these carriers, however, the status of the forwarder is still that of a shipper.' The Act referred to in the above quotation is the Interstate Commerce Act, as amended by the 1942 Freight Forwarders Act. That amendment defines a freight forwarder as 'any person which . . . holds itself out to the general public as a common carrier to transport or provide transportation of property . . .' Such forwarders are, by the Act, made liable to their customers. And such liability is, of course, that of a carrier to transport the customer's goods solely and without loss to point of destination." *Id.* at 519.

It should be noted that all of the above cases were decided subsequent to the 1950 amendment of 49 USCA, §1002(a)(5). In each case the court quotes *Acme* as support for the proposition that a freight forwarder has

a dual status. In its relations with its customers it has the status of a common carrier but in its relationship with underlying common carriers (those who actually transport the merchandise) it has the status of a shipper. The holding of the Court in *Acme* indicates that a freight forwarder, having the status of a shipper in its relationship with underlying common carriers, ". . . must file its claims within the period specified in the railroad bill of lading." *Acme, supra* at 470.

## *SHOULD THE HOLDING IN ACME BE LIMITED TO RAILROAD COMMON CARRIERS?*

Additionally, the *appellant argues that since Acme involved a railroad common carrier the . holding of that case should be limited in its application exclusively to railroads.*

While *Acme* did deal with a railroad common carrier there is no indication in that decision that the court sought to limit its holding to railroads alone. Specifically, the language used in the case is not indicative of an intent to limit the holding only to a particular type of common carrier, as throughout the decision they refer to carriers as common carriers or underlying carriers without differentiating between carrier by rail, highway or water.

Appellant has not furnished any case law, including *Acme,* which contains any language which would indicate that the Court's holding was limited exclusively to the type of common carrier involved in that case. We hold that it not only applies to railroad common carriers, but also to motor vehicle common carriers as well.

## *DOES EXISTENCE OF SEC. 409 CONTRACT LIMIT ACME HOLDING?*

Lastly, the appellant alleges that the existence of a service contract with an indemnification clause, pursuant to

49 USCA, §1009[7] between Universal and Chippewa distinguishes this case from *Acme*. The facts in *Acme* do not refer to the additional element of a service contract, but only involved the contractual arrangements in the bill of lading. It is this additional (service) contract and not the bill of lading the appellant claims that should govern the procedure for filing damage or loss claims. Universal contends that the respondent was not required to issue a bill of lading in this case, but did so merely for purposes of its own convenience.

Obviously, the appellant is not cognizant of sec. 319 of the Interstate Commerce Act which provides that:

---

[7] "1009. **Utilization by freight forwarders of services of common carriers by motor vehicle.** (a) Nothing in this Act shall be construed to prevent freight forwarders subject to this chapter from entering into or continuing to operate under contracts with common carriers by motor vehicle subject to chapter 8 of this title, governing the utilization by such freight forwarders of the services and instrumentalities of such common carriers by motor vehicle and the compensation to be paid therefor: Provided, That in the case of such contracts it shall be the duty of the parties thereto to establish just, reasonable, and equitable terms, conditions, and compensation which shall not unduly prefer or prejudice any of such participants or any other freight forwarder and shall be consistent with the national transportation policy declared in this act: And provided further, That in the case of line-haul transportation between concentration points and break-bulk points in truckload lots where such line-haul transportation is for a total distance of four hundred and fifty highway-miles or more, such contracts shall not permit payment to common carriers by motor vehicle of compensation which is lower than would be received under rates or charges established under chapter 8 of this title.

"(b) Contracts entered into or continued pursuant to subsection (a) of this section shall be filed with the Commission in accordance with such reasonable rules and regulations as the Commission shall prescribe. Whenever, after hearing, upon complaint or upon its own initiative, the Commission is of opinion that any such contract, or its terms, conditions, or compensation is or will be inconsistent with the provisions and standards set forth in subsection (a) of this section, the Commission shall by order prescribe the terms, conditions, and compensation of such contract which are consistent therewith."

"The provisions of sec. 20 (11) and (12) of this title, together with such other provisions of chapter 1 of this title as may be necessary for the enforcement of such provisions, shall apply with respect to common carriers by motor vehicle with like force and effect as in the case of those persons to which such provisions are specifically applicable." 49 USCA, §319.

Therefore, we hold sec. 20 (11) of the Act is applicable to motor vehicle common carriers such as Chippewa. Sec. 20 (11) of the Interstate Commerce Act provides that any common carrier subject to this provision, such as Chippewa, which receives property for transportation from a point in one state to a point in another state ". . . *shall issue a receipt or bill of lading* therefor, and shall be liable to the lawful holder thereof for any loss, damage or injury to such property caused by it . . .". (Emphasis supplied.)

Thus, in accordance with sec. 20 (11) of the Interstate Commerce Act, Chippewa was required to issue the bill of lading to Universal, the freight forwarder. Chippewa did in fact issue a uniform bill of lading to Universal for transportation of the merchandise which subsequently was alleged to have been lost by Chippewa in transit. The uniform bill of lading, sec. 2 (b), issued by Chippewa required as a condition precedent to recovery, the filing of written claims for damage or loss within 9 months:

". . . As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier issuing the bill of lading, or carrier on whose line the loss, damage, injury or delay occurred, or carrier in possession of the property when the loss, damage, injury or delay occurred, within nine months after delivery of the property (or, in the case of export traffic, within nine months after delivery at port of export) or, *in case of failure to make delivery, then within nine months after a reasonable time for delivery has elapsed;* and suits shall be instituted against any carrier only within two years and one day from the day

when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice. Where claims are not filed or suits are not instituted thereon in accordance with the foregoing provisions, no carrier hereunder shall be liable, and such claims will not be paid." (Emphasis supplied.)

This bill of lading, entered into pursuant to 49 USCA, §20(11), in turn, constituted a contractual agreement between Universal and Chippewa:

"Under the act every initial carrier is required 'to issue a receipt or bill of lading' upon receipt of a shipment, which constitutes the contract between the shipper and all the carriers . . . ." *Bassett v. Chicago & Northwestern Railway Company,* 168 Wis. 617, 621, 171 N.W. 749 (1919).

The additional contract between Universal and Chippewa to which the appellant refers, was only in the nature of a general service contract. Under that contract Universal promised to utilize Chippewa's carrier service in the course of its freight forwarding activities and Chippewa, in return, promised to supply its carrying services to Universal at a specified rate of compensation. This contract was more in the nature of a mutual association and service contract, with a general indemnification clause. Whereas the bill of lading issued by Chippewa constituted a separate and distinct contract for the shipment of specific freight to a stated destination with a limited and specific indemnification clause. When the appellant accepted the bill of lading from Chippewa it was deemed to have agreed to the terms listed in the bill of lading:

"The presumption arises from the delivery and acceptance of a bill of lading that the party receiving it assented to its terms. Ignorance of its contents 'arising from

failure to read it or to make some reasonable effort to obtain information in that regard, in the absence of any evidence of fraud . . . or of the use of any means to deter the shipper from fully understanding the contract, is not sufficient to overcome it.' [citations omitted]." *Ross v. Northrup, King & Co.,* 156 Wis. 327, 336, 144 N.W. 1124 (1914).

Acceptance of the bill of lading and its specific indemnification clause impliedly revoked the general service contract with its general indemnification clause.

One of the provisions of the bill of lading required appellant to file written claims, for lost or damaged freight, within nine months after delivery or after a reasonable time for delivery had elapsed. Appellant acknowledges that its claims were filed ". . . more than 9 months after the occurrence of the loss. . . ." Therefore, we agree with the trial court's decision to follow the holding in *Acme, supra,* and thus dismiss the appellant's cause of action on the grounds that the claims for reimbursement were not filed within the 9-month limitation period provided in the bill of lading.

*By the Court.*—The judgment of the circuit court for Eau Claire County is affirmed.